792 P.2d 926

Wayne KUNZ; Olive Kunz; Glenn V. Turner; Carol Turner, Plaintiffs–Appellants,

v.

**UTAH POWER & LIGHT COMPANY,** Defendant-Respondent.

No. 18076.

Supreme Court of Idaho.

April 3, 1990.

Racine, Olson, Nye, Cooper & Budge, Pocatello, for appellants. Louis F. Racine, Jr., argued.

Merrill & Merrill, Pocatello, for respondent. Stephen S. Dunn argued.

Webb, Burton, Carlson, Pedersen & Webb, Twin Falls, for amicus Salmon River Canal Co. Lloyd J. Webb argued.

Hon. Jim Jones, Attorney General, Boise, for amicus Department of Water Resources. Deputy Atty. Gen. John W. Homan argued.

**902**

BAKES, Chief Justice.

This case concerns an action brought in federal court by Kunz and various other landowners ("landowners") against Utah Power & Light Company ("Utah Power") for damages to real and personal property caused when Utah Power discharged water from an artificial storage system into a natural stream channel thereby flooding the riparian landowners' property. The United States District Court dismissed all of the landowners' theories of liability except for the negligence theory. The jury found that Utah Power was not negligent in its operation of the water storage system. The landowners appealed to the United States Court of Appeals, Ninth Circuit, alleging, among other things, that the district court erred in dismissing their alternative non-negligence theories. The Ninth Circuit was unable to determine whether, under Idaho law, an action may be maintained pursuant to strict liability, trespass, or private nuisance for damages caused by the storage and intentional, but non-negligent, discharge of water stored for irrigation and related purposes. Accordingly, the following three questions were certified to this Court by the Ninth Circuit 871 F.2d 85, pursuant to I.A.R. 12.1:

(1) Under Idaho law, may one be held liable without proof of fault for damages caused by the intentional discharge of water?

(2) Under Idaho law, may one be held liable pursuant to a direct trespass theory for damages caused by the intentional discharge of water?

(3) Under Idaho law, may one be held liable pursuant to a private nuisance theory for damages caused by the intentional, but non-negligent, discharge of water?

In its order certifying these questions, the Ninth Circuit provided this Court with the following factual summary of the case as it existed in federal court.[1]

Bear Lake lies on the border between Idaho and Utah. Bear River begins high in the Uinta Mountains of Utah, meanders back and forth between Utah and Wyoming, flows north some distance into Idaho, and finally turns back south into Utah, where it terminates in the great Salt Lake. Bear River does not naturally enter Bear Lake; instead it flows past it a few miles to the north. In about 1917, however, the predecessor of Utah Power constructed Stewart Dam on the river, diverting the river's flow southward via canals into Mud Lake, which connects with Bear Lake. Bear Lake is thereby utilized as a reservoir. After the water reaches Bear Lake, it flows northward out of the lake, by gravity or through pumping, via an outlet canal to rejoin the old natural bed of Bear River some distance north of Stewart Dam. Between certain maximum and minimum limits (the height of the release gates and the depth of the pumping intake facilities), Utah Power can control the flow out of Bear Lake, and it can close the lake so that the flow continues directly down the river. The use of Bear Lake for water storage is the central feature of the whole system. The dam, canals, and control facilities are located within Idaho.

Utah Power operates the system under the authority of various federal statutes, a court decree, and the Bear River Commission (established by the Bear River Compact, a joint effort of Idaho, Utah, and Wyoming). The explicit purposes for which Utah Power is commissioned to operate the system are (1) to store water for irrigation throughout the valley in Idaho and Utah below the Bear Lake facilities and (2) to generate hydroelectric power. In addition, as *Kunz I* [*Kunz v. Utah Power & Light Co.*, 526 F.2d 500 (9th Cir.1975)] conclusively established, Utah Power is required to use the facilities for flood control, particularly as to the spring runoffs of the watershed. Flood control is not one of the specified purposes imposed by the authorizations but is imposed by common-law negligence principles. *See generally* Kunz,

1. Although the parties in their briefs and arguments before this Court presented facts outside the Ninth Circuit's certification order, we consider only those facts contained in the order.

526 F.2d at 502–04.[2] Additionally, the Bear River Compact establishes a minimum irrigation reserve level requirement. Under the dictates of the compact, Bear Lake must be maintained at an elevation of 5914.61 [ft.].

Utah Power regulates the storage capacity of Bear Lake by adjusting the lake's elevation. The key period is spring because during that period the runoffs cause a substantial rise in the lake's elevation. The full capacity level of the lake is 5923.65 [ft.]. In regulating the lake elevation Utah Power balances the competing factors, including, irrigation, flood control, fish and wildlife, recreation, and power generation.

Landowners are numerous farmers who own or lease riparian lands, and a private irrigation company, located along the Bear River below Bear Lake. Prior to 1917 much of these lands were devoted to orchard grasses and wild hays, which were dependent upon flooding from natural spring runoffs to maintain their growth. The installation of the water storage system in 1917 harnessed the spring runoffs and stopped the flooding, so the ranchers converted their operations to alfalfa and cereal crops, which will not tolerate floods.

During the period between 1983–1986, the spring runoffs were unusually heavy. During this period, Landowners' lands were flooded by stored and naturally flowing waters which were respectively discharged and "bypassed" by Utah Power from Bear Lake into the natural channel of Bear River in amounts exceeding the carrying capacity of the natural channel.

In its certification order the Ninth Circuit noted what it concluded was the existence of two distinct lines of Idaho cases that appeared to apply different liability standards in cases that involve flood damage.

It described one line of cases as requiring a showing of negligence to hold a party liable for damages resulting from the escape, seepage, or percolation of water carried in an *artificial* channel, such as an irrigation canal or ditch. In these artificial channel cases non-negligence based theories of liability, such as strict liability, trespass, or private nuisance, are not recognized. See *e.g., Stephenson v. Pioneer Irrigation District,* 49 Idaho 189, 288 P. 421 (1930); and *Burt v. Farmer's Co-operative Irrigation Company, Ltd.,* 30 Idaho 752, 168 P. 1078 (1917). The Court of Appeals described another line of our cases which involve situations where a *natural* channel is altered or obstructed through the placement of barriers which diminish the ability of the channel to carry its natural volume thereby causing flood damage to another riparian landowner. Under these factual circumstances, the injured riparian landowner may not be limited to a "negligence only" cause of action. See *e.g., Campion v. Simpson,* 104 Idaho 413, 659 P.2d 766 (1983); *Milbert v. Carl Carbon, Inc.,* 89 Idaho 471, 406 P.2d 113 (1965); *Boise Development Company, Ltd. v. Boise City,* 30 Idaho 675, 167 P. 1032 (1917); and *Fischer v. Davis,* 19 Idaho 493, 116 P. 412 (1911). Our task essentially is to determine which line of cases more closely applies to the factual circumstances presented here, which involves an *artificial* water diversion and storage system (Bear Lake) which is subsequently discharged into a *natural* channel (Bear River) and thereafter causes flooding. For the reasons set forth below, we hold that the *Stephenson* and *Burt* line of cases applies to the facts of this case, and that negligence is the only basis for imposing liability on Utah Power. Accordingly, we respond in the negative to each of the certified questions.

The starting point in our analysis of which line of cases applies to the present

2. In *Kunz I* the United States Court of appeals described the duty of flood control which Utah Power owed to downstream riparian landowners as follows:

> Utah Power must carry the responsibility for avoiding damaging floods. We do not say that it is absolutely liable for flooding, but it must recognize the dependent position in which downstream ranchers have been placed and act accordingly to try, consistent with its other duties, to control floods. Utah Power, therefore, had a duty of care on which liability for negligent damage can be based.
> 526 F.2d at 504.

case is to explain why a distinction exists between them. For instance, why does Idaho case law limit the theories of liability which can be brought against a irrigation system operator whose canal floods over its banks when other cases arguably place no such limitations on the theories of liability which can be brought against someone who erects a breakwater into the natural channel that causes damage to the property owner on the opposite bank of the stream? The answer to this legal question is based almost entirely on the unique circumstances of Idaho's geography and economy. "The water of this arid state is an important resource. Not only farmers, but industry and residential users depend upon it." *Miles v. Idaho Power Company,* 116 Idaho 635, 645–646, 778 P.2d 757, 767–768 (1989). Because Idaho receives little annual precipitation, Idahoans must make the most efficient use of this limited resource. "The policy of the law of this State is to secure the maximum use and benefit, and least wasteful use, of its water resources. *Stickney v. Hanrahan,* 7 Idaho 424, 63 P. 189 [(1900)]; *Van Camp v. Emery,* 13 Idaho 202, 89 P. 752 [(1907)]; *Farmers' Co-operative Ditch Co. v. Riverside Irr. Dist.,* 16 Idaho 525, 102 P. 481 [(1909)]; *Coulson v. Aberdeen–Springfield Canal Co.,* 39 Idaho 320, 227 P. 29 [(1924)]; *Reynolds Irrigation Dist. v. Sproat,* 69 Idaho 315, 206 P.2d 774 [(1949)]; *Ramseyer v. Jamerson,* 78 Idaho 504, 305 P.2d 1088 [(1957)]; *Mountain Home Irrigation District v. Duffy,* 79 Idaho 435, 319 P.2d 965 [(1957)]; I.C. §§ 42–101 and 42–104." *Poole v. Olaveson,* 82 Idaho 496, 502, 356 P.2d 61, 65 (1960). See also *Gilbert v. Smith,* 97 Idaho 735, 552 P.2d 1220 (1976).

Idaho's extensive agricultural economy would not exist but for the vast systems of irrigation canals and ditches which artificially deliver stored or naturally flowing water from Idaho's rivers and streams into abundant fields of growing crops. Many of these irrigation systems depend on dams which divert naturally flowing water, storing it in reservoirs and later releasing it for use on irrigated lands through canals and ditches. These artificial water storage systems serve an additional need for flood control, power generation, recreation, and provide beneficial environments for fish and wildlife.

This Court has long been cognizant of the crucial role which artificial water systems serve in this state. As a result, limited liability rules have been applied to operators of these artificial water systems. Early on, in *Burt v. Farmers' Co-operative Irrigation Company, Ltd.,* 30 Idaho 752, 767, 168 P. 1078, 1082 (1917) we wrote:

> Under the common law one who diverted water from its natural course did so at his peril, and was held practically to be an insurer against damage which might result from such action. [Citing cases] The common law has been modified and relaxed in this and other arid states, so that the owner of an irrigation ditch is *only* liable for damages occurring to others as a result of his *negligence* or unskillfulness in constructing, maintaining or operating of the ditch. [Citing cases]. (Emphasis added.)

In *Stephenson v. Pioneer Irrigation District,* 49 Idaho 189, 194, 288 P. 421, 422 (1930), this Court wrote further that:

> [The owner of an irrigation ditch] is not an insurer against all damages arising from his ditches, but is liable when negligent in the construction, maintenance, and operation thereof. He is, in other words, required to exercise reasonable or ordinary care only in the construction, maintenance, and operation of his ditches.

*See also Albrethson v. Carey Valley Reservoir Company,* 67 Idaho 529, 186 P.2d 853 (1947); *Munn v. Twin Falls Canal Company,* 43 Idaho 198, 252 P. 865 (1926); *Nampa & Meridian Irrigation District v. Petrie,* 37 Idaho 45, 223 P. 531 (1923); and *Stuart v. Noble Ditch Company,* 9 Idaho 765, 76 P. 255 (1904). The same policies which compelled this Court to limit the liability of operators of irrigation canals from suit for all but an action in negligence also extends to those entities which operate the artificial water diversion and storage systems, *i.e.,* dams and reservoirs which supply the water to the irrigation canals.

This holding does not conflict with the other line of Idaho cases, identified by the Court of Appeals, dealing with the alteration or obstruction of natural streams. *See Campion v. Simpson,* 104 Idaho 413, 659 P.2d 766 (1983); *Milbert v. Carl Carbon, Inc.,* 89 Idaho 471, 406 P.2d 113 (1965); *Boise Development Company, Ltd. v. Boise City,* 30 Idaho 675, 167 P. 1032 (1917); *Fischer v. Davis,* 19 Idaho 493, 116 P. 412 (1911). These alteration or obstruction of natural stream cases present facts distinct from those contained in the case before us. Generally, these alteration cases involve situations where one riparian landowner takes measures to improve or protect its land from the natural stream flow thereby causing an alteration in the natural stream flow which injures another riparian landowner, usually the one on the opposite bank of the stream.

In *Campion,* the two parties involved owned land on the opposite banks of the Wood River at a point where the river naturally flowed through three channels. The defendant filled in two channels to protect his property from flood waters thereby reducing the river's overall channel capacity.[3] When the spring flood waters came the carrying capacity of the remaining channel was exceeded and Campion's property was damaged.

In *Milbert,* the parties owned land on opposite sides of the Palouse River. Milbert complained that Carl Carbon's blasting operations reduced the carrying capacity of the Palouse River during a high spring runoff thereby causing flooding to his land.

In *Boise Development Company,* the city was sued for flood damage to riparian landowners along the Boise River which occurred after the city constructed embankments, dams and riprapping along the opposite bank of the river in order to protect riverside parkland from erosion.

In *Fischer,* dams, cribs and obstructions were erected by Davis in order to protect his property from the Boise River. These measures, however, reduced the carrying capacity of the river thereby causing flood damage to Fischer, the landowner on the opposite bank.

The legal standard applicable to these "alteration or obstruction" cases is described in *Boise Development Company* in which we stated that "liability in such cases [does not] rest solely upon the narrow ground of negligence, but rather upon the broad legal principle that no one is permitted to so use his own property as to invade the property of another." 30 Idaho at 690, 167 P. at 1035. In *Campion,* we recently reaffirmed this standard as previously set forth in *Milbert, Boise Development Company,* and *Fischer.*

A riparian owner of land abutting upon a stream, whether navigable or non-navigable, has the right to place such barriers as will prevent his land from being overflowed or damaged by the stream, and for the purpose of keeping the same within its natural channel. A riparian owner, however, has no right to place obstruction into the stream for the purpose of changing the natural channel of the stream, or for any other purpose,

---

3. The operation of an artificial water diversion and storage system may at times diminish the carrying capacity of the natural stream into which it empties due to a lack of natural "scouring" which occurs during spring runoff. Such "scouring" clears the streambed of silt deposits thereby maximizing the stream's carrying capacity. We are not aware of any diminished carrying capacity in the Bear River due to the operation of the Bear Lake water storage system. The certification order only indicates that "naturally flowing waters ... were respectively discharged and 'bypassed' by Utah Power into the natural channel of Bear River in amounts exceeding the *carrying capacity of the natural channel.*" (Emphasis added.) We understand this to indicate that the amounts released into the natural channel of the Bear River would have caused flooding to the landowners regardless of whether the carrying capacity of the Bear River was diminished by the operation of the water storage system. Even so, we do not liken the possible diminution in the carrying capacity of a natural steam channel caused by the operation of a public reservoir to that diminution caused when a private party obstructs or diverts a natural stream channel for private gain. This position follows logically from the initial factual premise—the law of Idaho has developed to encourage the non-negligent management of Idaho's limited water resources in order to advance the economy and livelihood of Idaho's citizenry.

that would do damage to the riparian owner on the opposite side or to owners of land abutting upon the stream either above or below.

104 Idaho at 415, 659 P.2d at 768 (emphasis omitted.)

These obstructions of the natural channel cases do not apply to the factual scenario set forth in the Ninth Circuit's certification order. Utah Power, by diverting and storing, and later releasing the flood waters of the Bear River back into the natural channel, is carrying out its duty to "balance the competing factors, including irrigation, flood control, fish and wildlife, recreation and power generation." Order Certifying Question to the Idaho Supreme Court, p. 3. Balancing these competing and often conflicting interests as it must, Utah Power is only held to a standard of reasonableness, *i.e.*, negligence. As the owner and operator of the diversion and storage system, Utah Power "is not an insurer against all damages arising from [its storage system], but is liable when negligent in the construction, maintenance and operation thereof." *Stephenson v. Pioneer Irr. Dist.*, 49 Idaho 189, 194, 288 P. 421, 422 (1930). *See also Albrethson v. Carey Valley Reservoir Company*, 67 Idaho 529, 186 P.2d 853 (1947); *Munn v. Twin Falls Canal Company*, 43 Idaho 198, 252 P. 865 (1926); *Nampa & Meridian Irrigation District v. Petrie*, 37 Idaho 45, 223 P. 531 (1923); *Burt v. Farmers Co-operative Irr. Co., Ltd.*, 30 Idaho 752, 168 P. 1078 (1917); and *Stuart v. Noble Ditch Company*, 9 Idaho 765, 76 P. 255 (1904).

Accordingly, the landowners' claim against Utah Power, whether denominated strict liability, an action in trespass, or private nuisance, is not maintainable against Utah Power on the facts of this case in the absence of proof of negligence. The case of *Bradford v. Simpson*, 97 Idaho 188, 541 P.2d 612 (1975), cited and argued by the landowners, is inapposite, considering our conclusion that Utah Power's liability, if any, can be based only on negligence. In *Bradford* we reiterated the legal standard applicable to riparian landowners who obstruct the natural flow of a stream thereby causing damage to another riparian landowner. We further noted that "[s]uch obstructions have been characterized by the courts as continuing trespasses or nuisances." 97 Idaho at 192, 541 P.2d at 616. As discussed above, the legal standard elucidated in the *Campion* line of cases, including *Bradford*, does not apply under the factual scenario presently before us. Furthermore, our prior cases dealing with flooding from artificial water storage and diversion systems do not refer to trespass in the usual sense. Rather, our case law in this area refers to the concept of "trespass on the case," the common law description of an action based on *negligence* principles, and does not provide for absolute liability where, for instance, a reservoir operator non-negligently discharges water which causes flooding. *Verheyen v. Dewey*, 27 Idaho 1, 9, 146 P. 1116, 1118 (1915) ("[T]he Nampa and Meridian Irrigation District would be liable if it had negligently emptied said reservoir and injured the property of the plaintiff."). See also *Munn v. Twin Falls Canal Company*, 43 Idaho 198, 252 P. 865 (1926) and *Boise Development Company, Ltd. v. Boise City*, 30 Idaho 675, 167 P. 1032 (1917).

The landowners additionally rely on *Smith v. King Grazing Association*, 105 Idaho 644, 671 P.2d 1107 (Ct.App.1983) to argue that a cause of action in private nuisance could be maintained against Utah Power. Again we disagree. In *Smith*, the Court of Appeals noted that "courts generally have not applied the sweeping principle of nuisance law to surface water cases." 105 Idaho at 646, 671 P.2d at 1109. In any event, the *Smith* court held that an upper landowner may alter the flow in a natural watercourse "so long as it remains within the watercourse." 105 Idaho at 647, 671 P.2d at 1110. Under this analysis, Utah Power acted within its legal rights by discharging stored water within the natural watercourse of the Bear River.

Accordingly, we hold that under Idaho law the answer to each of the three certified questions, *ante* at 902, 792 P.2d at 927 is: No.

Costs, if any, on appeal to be fixed by the United States Court of Appeals.

JOHNSON and McDEVITT, JJ., and SCHROEDER, J. Pro Tem., concur.

BISTLINE, Justice, dissenting.

## PART I. INTRODUCTION

### THE CHALLENGE TO CERTIFICATION

The circuit court panel has presented this Court with the opportunity to review the two lines of Idaho cases which involve the release of retained water and respond with what we perceive to be the case law precedent applicable to the circumstances here presented. These circumstances appear to be almost identical to those presented in *Kunz I*, 526 F.2d 500 (9th Cir.1975), to the Honorable Ray McNichols, Chief Judge of the United States District Court for Idaho, and in turn to the circuit court panel.

When *Kunz II* was at the trial court level, Judge Callister, unlike Judge McNichols, did not allow the plaintiffs to pursue all of their theories of Utah Power's liability, which included trespass, nuisance, strict liability, and negligence. *Sua sponte*, Judge Callister relegated the plaintiff to the single theory of negligence. Why he did that knowing full well that Judge McNichols had done otherwise under almost identical circumstances cannot be ascertained from the record. Seemingly, when the plaintiff landowners learned in the 1975 action that they were entitled to pursue all of their theories, it would have been discomforting to be denied that same opportunity in the sequel case. A jury presented with all cognizable theories would be better able to discern which, if any, fit the evidence displayed for them by the parties.

A jury which was only instructed on one issue, in this instance, negligence, was shorted. The net result is that, should the circuit court panel conclude, albeit without this Court's assistance, that any one of the other three spurned theories is valid, the plaintiff landowners will face the expense of a second jury trial against an adversary better endowed monetarily. The circuit court panel obviously has no desire to preclude the plaintiffs from that second jury trial, and equally obvious, the landowners are willing to endure the expense and have at it. Accordingly, the panel has asked this Court to advise as to our perception of the state of Idaho law. My view is that this Court should endeavor to make a thorough review and analysis of all the pertinent case law touching on the subject.

Before we were positioned to approach that endeavor, Utah Power attempted to head us off at the pass. In a thirty page brief it opposed the panel's request for acceptance of the certified questions. The briefing which so sought to dissuade us was equally as supplicative as the brief which was later submitted addressing the issues presented by the three certified questions. The main theories of Utah Power's brief opposing the acceptance of the certified questions were two-fold: (1) That the panel misperceived what was to be learned from its rather extensive delving into Idaho case law precedent, much of which it has brought to our attention; and (2) that in any case for damages which is predicated on liability for interference with established and recognized water courses, negligence is the *only* applicable standard.

In urging the first, Utah Power declared that the panel's "suggestion that there is a second line of cases, highlighted by *Campion v. Simpson*, 104 Idaho 413, 659 P.2d 766 (1983), is not accurate. Not only are these cases factually distinguishable, but they also required proof of negligence before liability will be found." Defendant's Brief in Opposition to Certification at 14–15. The brief proceeds to explain the facts of *Campion* and in the process explains that liability could not be imposed on Simpson, who was only acting "to protect his own property, without proof that the actions were unreasonable *or* negligent." *Id.* at 15 (emphasis added). Absence of negligence is not necessarily reasonableness. Negligence was not involved in *Campion*, so it is removed from the equation, leaving only "unreasonable" as the adjective describing Simpson's conduct.

At least the author of the brief recognized that wrongful and negligent are not synonymous. Negligence, otherwise known as "fault," equates with carelessness, inattentiveness, or indifference. Wrongful conduct is conduct which is more akin to being deliberate, intentional, or calculated. In fact, the brief uses the word *intentional* in describing Simpson's conduct in filling two of three channels of the Wood River in an effort to protect his own banks, thereby increasing the flow in the third channel and ultimately damaging Campion's property. At page 16 of Utah Power's brief opposing certification, it made what appears to be an effort to synthesize negligent conduct and wrongful conduct as being one and the same. It did this by intimating that a comparative *negligence* standard is applicable where wrongful conduct combines with other causes to produce damages, citing *Campion*, 104 Idaho at 416–17, 659 P.2d at 769–70. The attempt fell short of its mark, however, and that argument was abandoned by simplisticly stating that without negligent conduct or wrongful conduct, there can be no liability. The brief failed to establish any inaccuracy on the part of the panel in its view of *Campion*, and is a remarkable display of creative brief writing at its best. Negligent and wrongful, in describing conduct, are two words with different meanings. Neither includes the other, but either can create liability.

Touching briefly on the second point of the brief's theme, it rather consistently, but ineffectively, argues:

3. *Negligence is the standard in water course cases.* As has been illustrated amply above, there is substantial Idaho law on the proper standards to be applied in water diversion, impoundment and discharge cases which involve watercourses or defined bodies such as lakes and reservoirs. Liability can be found in such cases only when there is proof of negligence. This court has spoken conclusively and repeatedly to that issue. Any attempt to impose liability without proof of fault is completely contrary to that very clear line of Idaho law and is precisely the reason the district court re-fused to allow these alternative theories to be pursued by the landowners at trial. Whether it is called 'nuisance' or 'trespass,' landowners are continuing to argue that they need not prove the negligence of Utah Power in order to sustain a prima facie case. Because there is ample Idaho law giving guidance on these issues, certification is unnecessary and should be rejected.

## CONCLUSION

Since this court has repeatedly and clearly spoken to the appropriate theory that may be used in an attempt to impose liability in water diversion, impoundment and transportation cases, there is no justification for accepting the Ninth Circuit's request for certification in this case. This court has clearly held that one may not be liable in cases of this type without proof of fault. Since all three of the theories pursued by the landowners, and now certified by the Ninth Circuit, would impose liability without proof of fault, they run contrary to clearly delineated Idaho decisions and unreasonably restrict the full development and use of one of the most vital resources in the State of Idaho, its water. The request for certification should be denied and the case returned to the Ninth Circuit for final resolution.

Defendant's Brief in Opposition to Certification, 29–30.

Only the theory of strict liability, *Rylands v. Fletcher,* 1 Eng.Rul.Cas. 236 (1868), could be said to allow imposition of liability without fault. The logical conclusion to be drawn from Utah Power's unprecedented attack against certification made in this Court is perhaps found in the words of Shakespeare: "Methinks he doth protest too much." The brief was not persuasive.

The minutes of the Court show Justices Shepard, Bistline, Huntley, and Johnson voting on the panel's request for acceptance of the certified questions. Justice Bakes deemed himself disqualified and did not vote, nor was a justice pro tem appoint-

ed to vote in his stead, as four of the votes cast were to accept the certification.

## PART II.

### THE ERRONEOUS INTERPRETATION OF *BURT*

Basically the task undertaken by the Circuit Court of Appeals is not to divine the answer to the three certified questions which it has referred to this Court, and which this Court has answered by three successive negatives, *no, no, no.* The panel has sought assistance from this Court in order to ascertain whether the United States District Court, the Honorable Marion Callister, committed error *sua sponte*, in taking away from the jury the issue squarely presented to the panel: Whether the United States District Court erred in its conclusion that *Burt v. Farmers Cooperative Irrigation Co., Ltd.,* 30 Idaho 752, 168 P. 1078 (1917), *"specifically rejected the strict liability doctrine set out in Fletcher v. Rylands,* L.R. 2, Exch. 265." Memorandum Decision of Judge Callister at 3. The district court made that strong statement of rejection of *Fletcher v. Rylands,* notwithstanding that it did so in the face of its own acknowledgment of this exact language from *Burt:*

> Under the common law one who diverted water from its natural course did so at his peril, and was held practically to be an insurer against damage which might result from such action. The common law has been modified and relaxed in this and other arid states, so that the owner of an irrigation ditch is only liable for damages occurring to others as a result of his negligence or unskillfulness in constructing, maintaining or operating the ditch. (Citations Omitted).

Memorandum Decision of Judge Callister at 3, quoting *Burt,* 30 Idaho at 767, 168 P. at 1082.[4]

Unfortunately, Judge Callister failed generally in his reading of *Burt,* and par-

ticularly in the paragraph quoted. The *Burt* court did not *reject* the common law doctrine of *Fletcher v. Rylands, i.e.,* strict liability for damages occasioned by the escape of artificially impounded waters. The *Burt* court was *aware* of *Fletcher v. Rylands,* which it cited to, as "L.R. 1 Exch. 265, affirmed, L.R. 3 H.L. 330; 1 Eng.Rul. Cas. 236." The citation continued on by citing for the same proposition three cases from Massachusetts and one case from New York.[5]

The extent of the *Burt* quotation is set out in two sentences. The first sentence concerning the common law is sound, and is indeed supported by its citations. This was all a matter of elementary learning in first year law school torts. The second sentence is equally sound, provided, however, that the reader comprehend that it has absolutely no application to the preceding sentence, but rather is confined to the liability of one who constructs, maintains, and operates a *ditch.* A ditch is a ditch, and in Idaho law we deal with drainage ditches and with irrigation ditches as artificial structures which are by no means entitled to the same status as is accorded to natural water courses. All that the *Burt* court was saying at that point in its discussion was that the common law of Idaho would not accord to non-natural water courses the status which the common law in England, and the common law developed by that time in Massachusetts and New York, accorded to natural water courses, *including natural water sources impounded into reservoirs.* 30 Idaho at 567, 168 P. at 1082–83. While it is readily understood that one judge, Judge Callister, was led astray by his own misreading of *Burt,* it is not understood how four Idaho jurists could in turn so readily subscribe to Judge Callister's view that *Burt* "specifically rejected the strict liability doctrine set out in *Fletcher v. Rylands.*" The ready answer is simply the failure to do at least a modicum of homework.

---

4. The same quote, made the backbone of the thesis of Chief Justice Bakes' opinion for himself and three other justices, is set forth in that opinion at 904, 792 P.2d at 929.

5. Inexplicably, Chief Justice Bakes in authoring the majority opinion has omitted all citations found in *Burt.*

The reader of Judge Callister's memorandum decision, and in turn today's opinion for the Idaho Supreme Court, is left with the clear impression that *Burt's* statement implies that the common law has been relaxed by *judicial* determination, that the concern in *Burt* was predicated upon a land owner's suit against the owner (or constructor, or maintainor) of an irrigation ditch, and that the issue there was whether an injured and monetarily damaged land owner could recover on a strict liability theory as well as on a negligence theory.

The actual fact of the matter is miles apart from the impression created. While I am not privy to Judge McNichols analysis of *Burt* (in *Kunz I*), it is strong in my mind that he was aware of what the *Burt* case was all about. *Burt* was not a damage action, and in that respect alone it should have played no part in Judge Callister's order in *Kunz II* which deprived the landowners of their clear right to proceed against Utah Power on the theory of strict liability.

Additionally, the language in *Burt* relative to modification of the common law had nothing to do with any judicial action. It did have to do with legislative action. As is often the case, the reading of the *full* caption of a reported case may be helpful:

C.G. BURT, W.W. NUSBAUM and F.G. PICKETT, Commissioners of Drainage District No. 1 of Canyon County, Appellants,

v.

FARMERS' CO–OPERATIVE IRRIGATION COMPANY, LIMITED, and NOBLE DITCH COMPANY, LIMITED, Respondents.

30 Idaho 752, 168 P. 1078 (1917). In the year 1913, the legislature authorized the creation of drainage districts. 1913 Sess. Laws, ch. 16, p. 58. The plaintiff in *Burt*, Drainage District No. 1, Canyon County, was created in accordance with the statute, and its domain established. The trial court's pertinent findings and conclusions are set out in the reported case. Included therein are provisions of the enabling legislation. Of specific pertinence is Section 9, which provides that the Commissioners shall report and determine, "[f]ourth: What lands will be injured [by the construction of a drainage system] and the aggregate amount of such injuries, and they shall award to each tract, or lot, by whomsoever held, the amount of damage so determined by them." In a similar vein, the fifth paragraph of Section 9 made provision for the determination of the benefits which would arise from the construction, and provided that the commissioners of the district should "apportion and assess the estimated costs of the same on the lands so benefitted ...," all of which is more fully set out in the reported case, 30 Idaho at 761–62, 168 P. at 1080–81.

Section 9a was added to the Act in 1915, prior to the litigation, judgment and appeal in *Burt*. It provided:

In determining the amount which each tract of land will be benefited by such proposed drainage system *the commissioners shall consider the damage done to low land from seepage and saturation by irrigation water from high land* and the necessity for the carrying off of waste water, *and such high lands shall be considered as being benefited to the extent and in the amount that such lands are responsible for damage to low lands* from seepage and saturation by irrigation water.

1915 Sess.Laws, ch. 42, p. 123–25; 30 Idaho at 763, 168 P. at 1081 (emphasis added). At that point the court noted that, although the legislative power had not been directly called in question, precedential case law from the Supreme Court of the United States was dispositive, discussing the same on pages 763 through 765. At page 765, the *Burt* court declared that,

[t]he object sought to be accomplished by the addition of Section 9a is not difficult to determine. We quote from the opinion of Mr. Chief Justice Sullivan in the former appeal (29 Idaho [377] 393, 161 P. [315] 320 (1916), as follows:

It seems in this irrigated country the question of drainage is now confronting almost every irrigated section, and there seem very cogent reasons for a return to the former rule above stated

(referring to the common-law rule hereafter stated), at least to the extent of assessing lands for the construction of a drainage system from which seepage or percolation damages or injures other lands. The early settlers of the arid regions were not confronted with the question of drainage, but time and experience have proven that a drainage system is absolutely necessary where large areas of desert land are reclaimed by irrigation.

30 Idaho at 765–66, 168 P. at 1082. The *Burt* court went on to explain the 1915 amendment:

By section 9a it is provided that *such high land shall be considered as being 'benefited' to the extent and in the amount such lands are responsible for damages to low lands from seepage and saturation by irrigation water.* We have no doubt of the power of the legislature to provide that lands which by reason of artificial irrigation contribute by seepage and saturation to the swampy condition of lower lands shall contribute their just proportion of the cost of the construction of drainage works for the reclamation of such lower lands. This court has held that an irrigation district may construct drainage works as a necessary complement of its irrigation system. [Citations omitted.]

30 Idaho at 766–67, 168 P. at 1082 (emphasis added). It was against that backdrop that the *Burt* court continued on with the statement that "[u]nder the common law one who diverted water from its natural course did so at his peril, and was held practically to be an insurer against damage which might result from such action. (*Fletcher v. Rylands*, L.R. 1 Exch. 265, affirmed L.R. 3 H.L. 330; 1 Eng.Rul.Cas. 236)...." 30 Idaho at 767, 168 P. at 1082.

On a proper viewing of the *Burt* opinion, it is readily seen that the real issue at stake was the questioned authority of a drainage district to obtain monetary payments from the two named defendants through *assessments levied because of benefits conferred.* The defendants in their argument likened the assessments to damages masquerading under a different guise, and

hence contended that they were unjustly treated because they were not proven to be guilty of any negligence. The court's *holding* in response to that argument was very simply stated: "No reason is apparent why the legislature may not restore the common-law rule in part or for some purposes only, *as it undertook to do in section 9a.*" 30 Idaho at 768, 168 P. at 1083 (emphasis added). Conversely put, the legislature can restore the common-law rule in part, and here it did so in enacting section 9a.

The *Burt* case went on to use a police power analogy in explaining that section 9a was valid:

Nor must the legislation be held invalid because the legislature in terms provided for the enforcement of a liability as though it were a special benefit to the lands assessed, although the ground for the liability may be found in the police power of the state. (*Donnelly v. Decker*, 58 Wis. 461, 46 Am.Rep. 637, 17 N.W. 389.) The legislature having power to provide for the levy of the assessment, the legislation must be upheld, even though in providing for the execution of the power the legislature may have confused the principles upon which the assessment was to be based, and may have provided in the same act for the levy of assessments on the basis of benefits received and responsibility for injuries inflicted.

30 Idaho at 768, 168 P. at 1083. Earlier on the same page the court had stated the reasoning which supported its police power rationale as a means of effecting assessments on land for benefit conferred:

The practical effect of requiring assessments to be made against the tract of land as a benefit, instead of creating a personal liability of the owner thereof, is to relieve the owner of the tract from any personal liability. By a proper exercise of the police power of the state the owner of land might be held personally liable for any damage which results from his action in bringing water upon his land by artificial means. If the legislature chose to provide for such liability only in connection with drainage districts and to

limit assessments to the lands only and relieve the owners from personal liability, the owners cannot be heard to complain.

30 Idaho at 768, 168 P. at 1083. The holding of *Burt* is inescapable. The general discussion of the relaxation of the common law as applied to ditches is simply dicta. It served only the purpose of leading into the court's conclusion that where assessments for benefits conferred by the construction of a drainage system are concerned, the 1915 amendment reinstated the common law rule that lack of negligence was not a justifiable reason for refusing to pay the assessment.

## PART III.

## CONCERNING THE ERRORS OF UTAH POWER'S WAYS

In its briefing to this Court, Utah Power made a number of factual allegations which have not yet been held up to the truth-seeking light of trial. Despite their lack of finality and the fact that the district court has yet to consider most of the evidence in the context of a trial (keep in mind the procedural posture of this case: The landowners are appealing from the effective dismissal of several substantive theories, not from a judgment entered subsequent to trial) these factual allegations were made and apparently considered by this Court. It therefore behooves someone to refute them.

One such set of allegations derives from Utah Power's argument that one benefit to the landowners of the Bear River–Bear Lake system is the availability of additional irrigation water for reclaimed agricultural lands. Utah Power Brief at 2. However, Utah Power fails to disclose the direct primary benefit to *it* of millions of dollars of earned profits from hydropower generation.

Despite Utah Power's omission, this Court should not ignore the plain economic motivation for which Utah Power's series of hydropower generating plans and related water reservoirs and control works were originally constructed and continue to be operated.[6] Utah Power's attempt to divert attention from its business purpose of generating and selling electricity for profit by cloaking its activities under a mantle of alleged benevolent service to irrigation, recreation, and fisheries interests, is a mere tactic designed to support its specious "balancing" contention.

Utah Power contends that how it makes management and operational decisions regulating the storage level in Bear Lake, including alleged reliance on snow survey and forecast runoff reports and other data, supports the reasonableness of its operations. Utah Power Brief at 2. It characterizes the Circuit's finding that the 1983–1986 spring runoff was "unusually heavy" as an "understatement," while conceding it to be accurate. *Id.* Utah Power then amplifies the record by selectively quoting certain statistics to support its alleged reasonable operations. The Circuit omitted any specific statistics in its factual statement and findings.

Utah Power's select statistics should have been regarded by this Court as outside the factual record. More importantly, however, Utah Power's "statistics" are grossly incomplete and misleading for several reasons, and illustrate the maxim that "anything can be proven with statistics" and their selective manipulation.

Utah Power sought to create the impression that the "unusually heavy" runoff was solely responsible for the flooding discharges, and thus eliminate its own significant role in creating the problem. Utah Power's statistics failed to advise the Court that there was more than adequate storage capacity which *could* have held *all* of the *actual* runoff which occurred in the flood

---

**6.** As a side note, it bears mentioning that the trial court *excluded* the Landowners' proffered evidence regarding Utah Power's interest in maintaining a high lake elevation to maximize hydropower profits, despite its obvious relevancy and materiality. This evidentiary ruling apparently has been challenged by the Landowners as reversible error on even the negligence theory in the Circuit Court, and will presumably be decided in the Circuit's ultimate opinion.

years 1983–1986, *if* Utah Power had regulated the lake level consistently with the irrigation reserve provided by the Compact. Utah Power refused to do so. In addition, Utah Power's statistics failed to advise the Court that in each flood year, even *prior* to spring runoff commencing, Utah Power had allowed the lake to be at 5919 feet or higher, far in excess of the irrigation reserve of 5914.61 feet set by the Compact.

Utah Power's statistics failed to advise the Court that significantly less flooding and damage would have occurred if Utah Power had met its own target lake level elevation of 5918 feet in the flood years 1983–1986. It failed or refused to do so. Utah Power's statistics failed to advise the Court that Bear Lake is functionally *full* at a 5923 foot level. Utah Power's failure to operate consistently with the irrigation reserve level, or even to meet its corporate-set 5918 foot target level, converged with the "unusually heavy" (higher than average) runoff to create the necessity for Utah Power to make flooding discharges. Utah Power's statistics also fail to advise the Court that the *arbitrary* maintenance of elevations higher than required by the irrigation reserve provided in the Bear River Compact was *solely discretionary* on the part of Utah Power.

Utah Power failed to advise the Court that its corporate operating policy establishing a target lake elevation of 5918 feet *posed a risk of flooding downstream landowners one year in every five* according to its own prior risk analysis study done in 1971.[7] *See* Appendix A, which is the cover memo and pages 3 through 5 of the Bear River–Bear Lake operating criteria prepared by Utah Power in October of 1971, *after* the initial flooding which ultimately gave rise to the litigation in *Kunz I.* Utah Power conceded at trial that its 5918 foot corporate-set target lake elevation was exceeded prior to spring runoff in each year from 1983 through 1986. From these facts it is evident that the effect of lake elevations higher than Utah Power's optional "Minimum Power Release Elevation"

of 5918 feet, or the Compact's irrigation reserve level of 5914.61 feet, placed the risk of flooding damage squarely on downstream landowners in years of higher-than-average or "unusually heavy" runoff. Yet Utah Power did not tell the Court that all historic runoff statistics compiled since the facilities were constructed in 1917 establish that *no flooding in any year* through 1986 would have occurred, if Utah Power had operated consistently with the 5914.61 foot irrigation reserve level.

It is clear that Utah Power has declined to operate the system in a manner which would be consistent with the Bear River Compact. This is evidenced by the adoption of a "Minimum Power Release Elevation" level of 5918 feet as company policy, despite the fact that the level, *on its face*, did not comply with the Compact. In the "unusually heavy" successive runoff years of 1971–1972 and 1983–1986, even a reduction to the 5918 foot level was not achieved. Thus the runoff could not be contained, nor could discharges of water beyond the banks of Bear River, with resultant flooding, be avoided.

Historically, the Bear River drainage has been known to be highly variable as to quantity and timing of spring runoff, even more than most watersheds. This is due to extremes in geographic features, including elevations, and to the variability of weather patterns. *See, Kunz I,* 526 F.2d at 502.

Utah Power knows that actual runoff in prior years has been two to two-and-one half times above projected runoff. That situation occurred in 1971–1972, and was litigated in *Kunz I.* Thus Utah Power's assertion that it was "surprised" when the same level of runoff occurred in 1983–1986, lacks credibility. What happened in 1971–1972 and again in 1983–1986, could hardly have come as a surprise or have been unforeseeable. The fact is Utah Power simply chose to operate on the basis that if heavy runoffs occurred the risk would be transferred to landowners below Bear Lake.

---

7. This evidence was excluded by the trial court, and is another evidentiary ruling challenged as reversible error by the Landowners in the Circuit.

Utah Power's balancing of competing interests argument is simply used to justify the low priority Utah Power gives to meeting the flood control duty it clearly had after *Kunz I.* It is not surprising that the interests of recreation and fisheries, which allegedly favor a high lake level, *directly parallel* Utah Power's hydropower and irrigation interests.

Despite Utah Power's lip service to balancing the various interests, the *objective* facts demonstrate that Utah Power operated the system, as a matter of corporate policy and after study and deliberation, with little or no regard to the flood control duty owed to downstream landowners. Utah Power's assertion at page 4 of its brief that "in 1983, when the tremendous and unforecasted runoff occurred, Utah Power stored as much of the runoff as was physically possible," *begs the issue.* The amount of water it is physically possible to store varies depending on Utah Power's advance planning and regulation of the lake level.

Utah Power's attempt to distinguish between stored and bypassed water is a distinction without a difference. Utah Power undertook to and did divert, manage, and control *all* of the natural flow of Bear River. It diverted *all* such water by Stewart Dam into its regulatory system and artificial works and attempted to control and manage storage and releases, whether bypassed or not. In fact, Utah Power made controlled discharges from its diversion works which released combined stored and bypassed water in excessive quantities into the natural downstream channel of Bear River, which in turn overflowed the banks onto Landowners' lands. The Circuit's Order so states.

Utah Power has the responsibility, both legal and moral, to ensure that discharges do not exceed the carrying capacity of the natural channel. This responsibility flows from Utah Power's voluntary undertaking to dam and control the water; its exclusive control, and the Landowners' dependent position and total lack of control; the lack of flood easements or other legal authorization for overflows of released water from the natural channel; and the plain language of the Dietrich Decree which limits Utah Power's discharges to the "natural channel."

Utah Power insists the Dietrich Decree gives Utah Power the right but not the obligation to divert and store up to 5500 cfs from Bear River (an amount greater than any historic natural flow). Such an argument deliberately ignores the plain language of the Dietrich Decree, as construed in *Johnson v. Utah Power & Light,* 215 F.2d 814, 816 (9th Cir.1954), and *Gossner v. Utah Power & Light Co.,* 612 P.2d 337 (Utah 1980). Those cases held that Utah Power has no right to discharge water from its system into the natural channel of Bear River in amounts which overflow the banks. *Johnson* and *Gossner* directly contradict Utah Power's construction of the Decree, and this Court should have followed the holding in those cases.

The Compact represents the balance achieved through the legislative process and through interstate negotiations between Idaho, Wyoming, and Utah. It was approved by Congress. The Compact's balance is consistent with the Dietrich Decree, which is the source of Utah Power's water rights on the Bear River, and with the Idaho statutory and common law governing water rights, trespass and nuisance.

Utah Power disregarded the balance of the Compact arrived at through this process. Utah Power concludes it is free to operate at any higher level it deems in its exclusive wisdom is appropriate. The higher lake level Utah Power deems appropriate not surprisingly favors its own interests and is consistent with its perceived duties to recreation and fisheries, thereby sacrificing the legal flood control duty which would protect the Landowners.

Utah Power diverts at its Stewart Dam the entire flow of the Bear River, the major river system in a several thousand square mile drainage area covering parts of three states. The size, degree and magnitude of Utah Power's artificial works, and its control of all flows in Bear River, plus the substantial hydropower generated as a result of harnessing the entire natural flow

of the Bear River, *clearly distinguish the Bear River system from the irrigation and drainage systems which have formed the factual backdrop for so many of the Idaho cases* which deal with the damage occasioned by the release of stored or managed water. This is a distinction not only of degree, but of kind, and it therefore merits the adoption of rules which take into account the unique facts which set such large operations apart from other systems.

## PART IV.

## FAILURES OF THE MAJORITY OPINION

The Ninth Circuit appeal by the Landowners, which underlies the certified questions which are before *this* Court, is two-pronged: It challenges the validity of the evidentiary rulings and instructions in the negligence action, and also challenges the *sua sponte* dismissal of the alternative theories. The majority opinion fails to recognize the two-pronged nature of the appeal.

The majority opinion fails to comprehend that in each of the three certified questions reference to Idaho law implicitly means *existing* Idaho law. The panel's concern is the state of Idaho law, both statutory and case precedent, which was in effect at the times when the flood-damaging waters were intentionally released by Utah Power. This Court has not been asked to redefine the law, or to declare what it *presently* perceives the law *ought* to be. This Court has no controversy before it, and hence has no occasion to forge new law.

Yet the majority opinion, after reciting the three certified questions, and after noting the panel's recognition of two lines of cases emanating from this Court, develops its own approach to answering the questions: "Our task essentially is to determine which line of cases more closely applies to the factual circumstances presented here, which involves an *artificial* water diversion and storage system (Bear Lake) which is subsequently discharged into a *natural* channel (Bear River) and thereafter causes flooding." At 903, 792 P.2d at 928. Readily appearing to dictate a pre-ordained re-

sult, the Court holds that "the *Stephenson* and *Burt* line of cases applies," and accordingly responds "no" to the three certified questions which supposedly tells all. *Id.*

The Court asks itself: Why does Idaho case law limit the theories of liability which can be brought against a ditch/canal constructor/owner/operator whose waters overflow, whereas no such limitations apply where the transgression is in placing an obstruction or breakwater barrier in a *natural* water course? The question is both poorly worded, and diversionary. The evolving law as to non-natural watercourses dealt initially in terms of seepage and flooding from artificially constructed irrigation (and, later, drainage) canals. In regard to such artificial irrigation works, it was *statutory law* which imposed a duty of care upon the constructor/owner/operator.

To the interested reader, it may seem inconceivable that an opinion emanates from this Court, in response to the panel's straight forward request for an answer to three questions, which makes no mention of I.C. § 42–1204, and the thorough discussion of its application made by Justice McFadden in authoring this Court's 1976 *Brizendine* opinion, *Brizendine v. Nampa Meridian Irrigation Dist*, 97 Idaho 580, 548 P.2d 80 (1976). That opinion was unanimous. One of those justices is the author of today's opinion for the Court. Today's majority in speaking of *Burt* states that therein *"we* wrote:...." At 904, 792 P.2d at 929 (emphasis added). Every justice on the Court when *Burt* was issued has long ago passed away. Although *Burt* was correctly decided, better I would think that today "we" would more providently be concerned with the teaching of *Brizendine*. Unfortunately for *Brizendine*, it does not fit into the theme of what some may perceive to be the very shallow analysis by which the majority opinion is today able to espouse that "[t]he same policies which compelled this Court to limit the liability of irrigation canals from suit for all but an action in negligence also extends to those entities which operate the artificial water diversion and storage systems, *i.e.,* dams and reservoirs which supply the water to

the irrigation canals." At 904, 792 P.2d at 929. This assertion is made despite the fact that no statute analogous to I.C. § 42–1204 exists for artificial water diversion and storage systems. The statute which modified the common law and which undergirds the limitation of liability applicable to irrigation canals does not apply to dams and reservoirs. Therefore, that modification of the common law should not apply to limit the theories of liability available to plaintiffs who seek compensation for damage caused by waters released from dams and reservoirs.

Quietly and subversively the majority opinion puts irrigation ditches and canals in the same category with dams and reservoirs. This it does without any examination of the two Idaho cases cited to by the *Burt* court, the territorial decision of *McCarty v. Boise City Canal Co.*, 2 Idaho 245, 10 P. 623 (1886), and *Stuart v. Noble Ditch Co*, 9 Idaho 765, 76 P. 255 (1904). The *McCarty* opinion was issued just three years after the enactment of what is now codified as I.C. § 42–1204, and which has not been amended in 110 years. Obviously the complaint in that action was founded on the statute. The allegations of the complaint included the giving of notice to the defendant in compliance with the statute, and the defendant's yet persisting in not repairing his ditches so as to stop the overflowing of plaintiff's land. The real issue in the case was defendant's claim that plaintiff at very little expense to himself could have avoided the damages. The *Stuart* case was somewhat different, but not much. The allegations of the complaint were couched in the language of what is now I.C. § 42–1204. Likewise the requirement of notice was apparently involuntary under the statute. Although the company called itself the Noble Ditch Company, it appears that it was the owner and operator of a ditch of sufficient stature to be called a canal. Those two cases seem to stand for no more than that the statute mentioned created liability, and there was no need to resort to invoke any claim of strict liability. For certain those cases were not limitations on the liability imposed by *Fletcher v. Ry-*lands, but rather were *creation of statutory* liability.

The majority opinion, notwithstanding the exhibition of little research into prior case law, is entitled to credit for its citation to *Boise Development Co. v. Boise City*, 30 Idaho 675, 167 P. 1032 (1917). The majority sees that *Boise Development* case as dealing with the alteration or obstruction of natural streams, which, in consideration of the fact that the instant case deals with the natural stream or watercourse which was at one time the Bear River, makes pertinent the statement that " 'liability in such cases [does not] rest *solely* upon the narrow ground of negligence, *but rather upon the broad legal principle that no one is permitted to so use his property as to invade the property of another.'* 30 Idaho at 690, 167 P. at 1035." At 905, 792 P.2d at 930 (emphasis added).

However, it is quickly observed that the citation to the foregoing case is but a diversionary tactic. The author immediately retreats to asserting that such case law has no application "to the factual scenario set forth in the (panel's) certification order." *Id.* This thought is said to flow from the fact that Utah Power is simply carrying out *its* balancing duty. Apparently this is urged upon the premise that Utah Power has God-like authority in that regard. The explanation is that in carrying out its duty, Utah Power must not be held to any standard of conduct other than reasonableness, and that reasonableness must be only equated with not being negligent. This is not acceptable, except to the four members of this Court who wrongly apply it to the claim of the plaintiffs in this case. To my mind, it is pure *ipse dixit*, every bit as much as so as Utah Power's supplications to this Court to decline to accept the certified question. Utah Power, completely in charge of the operation by which the waters of a natural watercourse, Bear River, were impounded, and stored in a reservoir superimposed on Bear Lake, has assumed the responsibility that goes hand in glove with authority. *Kunz I*, 526 F.2d 500, taught Utah Power the lesson of foreseeability. Yet, far into the spring months of each of the years in question, it filled that

reservoir to the point where it became inevitable that the lands of the landowners would be flooded. The decision to throw this risk to the landowners was one within the power of one entity to make—Utah Power.

The decision to do as it did was not negligence. Far from that, it appears to have been just the opposite, a calculated business decision, a matter of corporate economics. Eventually it all came to pass, and the stored waters had to be released, not to irrigate the farms of the landowners but to flood those fertile fields. This type of conduct is available to corporate entities. The only risk of decision which they faced was the possibility of being sued, not a bad risk at all to those who know the tremendous expense and risk of litigation. The landowners have been inequitably treated, whether they ultimately prevail or lose.

As I stated earlier, far better that Chief Justice Bakes and those who joined his opinion would have been more concerned with the *Brizendine* case, wherein Justice Bakes was part of a unanimous Court. That Court clearly understood that the rule of *Rylands* was alive and well in Idaho. Justice McFadden is not now, and was not in 1976, much given to idle writing. Had he thought that *Rylands* had expired somehow, he would have so written. Instead he wrote that the cross-appeal need not be considered because the plaintiffs had prevailed on the theory of negligence. In signing on to Justice McFadden's opinion, not one member of the Court spoke up to urge that *Rylands* had died somewhere in the past. The rule of *Rylands* clearly applies to the claim of the plaintiffs. Moreover, a deliberate, calculated, intentional decision on the part of Utah Power to continue the impounding of waters far into the spring months, knowing what it knew, and the previous experience it had had, was not negligence but deliberate conduct, and a jury is entitled to hear the evidence. Nor can I see any reason for not allowing the jury to hear evidence on the theories of trespass and nuisance. Clearly the state of Idaho law at the least allows the landowners the opportunity to test out their claims.

## APPENDIX A

**To** Mr. John S. Anderson   **From** James S. Hooper   **Date** October 5, 1971

**ADDRESS**

**REPLYING TO**      **DATE**      **OUR FILE NO.**

**SUBJECT** BEAR RIVER-BEAR LAKE OPERATING CRITERIA   **YOUR FILE NO.**

A detailed study of Bear River and Bear Lake Operation has been made and is attached for your information. This report contains considerable statistical analysis of water availability and operation of the lake and river system based upon the limitations of the channels, irrigation requirements and power production. An operating practice which is similar to the practice used in the past has been established. This operating practice is referred to as, "Minimum Power Release Elevation" (MPRE). The MPRE is the elevation of the lake above which storage water will be released to keep Grace H. E. Plant fully loaded. When the lake elevation drops below the MPRE, releases for irrigation purposes are the primary releases to be made.

It has been concluded from the study that the MPRE for Bear Lake should be 5918.00 feet. This conclusion was reached based upon many factors. Three major factors predominate and are listed in order of priority.

1. The prime consideration in operation of Bear Lake is to provide for irrigation purposes. It is the Power Company's obligation to store prudently water in Bear Lake in order to satisfy the irrigation requirements of the Bear River Basin.

2. In the operation of Bear Lake, matters relating to flood control and recreation are considered.

3. The operation of Bear River hydro electric plants will provide energy in the most economical load pattern for electrical system operation.

With the HPRL of 5918.00 feet, there is a probability based upon past years' of record that water will be spilled past Grace on an average of one year out of every five years and that the lake will reach a minimum elevation of 5909.50 feet about once in 55 years. While the minimum operating level of 5902.00 feet is possible with the pumps at Lifton, it has been determined that a sandbar has built up in the channel to the Lifton Pumps in Bear Lake to an elevation of 5913.00 feet. From the study, the elevation of 5913.00 feet would occur about once in every 12 years.

## Conclusion

The prime consideration in operation of Bear Lake is to provide for irrigation purposes. The secondary consideration is to operate the Bear River Hydro Electric plants in the most economical load pattern to provide energy for electrical system operation, without conflicting with the primary consideration for irrigation needs. It must be recognized that during a series of dry years, the elevation of Bear Lake could approach the level of no usable content. This elevation is 5902.00 ft. which is the lower limit of the pumping facilities at Lifton. The meander line of Bear Lake has been determined to be 5923.65 ft. The installed storage control facilities of Bear Lake and North Lake will allow a maximum elevation of 5923.65 ft. The construction of resort facilities and cabins around the lake in some cases did not provide protection against water damage at elevations approaching 5923.65 ft. This is of concern to the owners of such facilities, particularly under conditions of high wind and high waves on the lake when some damage has been encountered. In the normal operation of Bear Lake, a high elevation of 5923.00 ft. is considered to be the limit. This will allow 0.65 ft. to take care of unexpected flooding conditions that might occur as a result of general heavy rainstorms in the spring of the year or early summer. With heavy rainstorms, it could be possible in combination with a heavy runoff year that the control of Bear Lake at 5923.00 could not be accomplished, leaving the 0.65 ft. (45,865 acre ft.) to take care of the unusual conditions.

It must be recognized that due to the release limitations of Bear Lake storage water brought about by restricted downstream channel capacity, Bear Lake elevation control is limited. In a series of wet years the lake will fill and stay above a desired drawdown level even with maximum releases

considering downstream limitations. The drawdown of Bear Lake to a desired level could take three to four years, based on past years' of record. Recognizing these limitations and the time necessary to draw down Bear Lake, a long term desired operating level must be established that is adhered to rigidly. This level will be the desired level such that if the lake exceeds this level, water releases will be made, taking into consideration the generating plant limitations and the channel limitations to fully utilize the water released for irrigation and generation without spill. If the elevation is below the desired level, no water releases will be made for generation purposes except for emergencies. This desired level will be referred to as "Minimum Power Release Elevation", (MPRE). A level of 5918.00 ft. has been established as the Minimum Power Release Elevation. Strict adherence to the MPRE of 5918.00 must be carried out. It is recognized that on a short term basis some adjustment, "fine tuning", can be carried out that will not affect the long-range adherence to the MPRE criteria. Operation to achieve this MPRE of 5918.00 will result in a condition where Bear Lake will fill to 5923.00 approximately one year in every five years. It must be further recognized that when the lake fills to 5923.00 ft. there will be years where it will be required to bypass North Lake using the old river channel below Stewart. Such releases will create flooding conditions similar to the condition encountered in the spring in 1971. With the MPRE of 5918.00 ft., it must be expected that the lake will be below the irrigation reserve of 5914.41 ft. one year in every seven years. Further, with this operation the lake could reach 5909.50 ft. one year in every fifty-five years. This allows a safety margin of 7.50 ft. (431,602 acre feet) above the minimum pumping elevation of Lifton. This also allows consideration for the sandbar that develops in the inlet channel in Bear Lake to the Lifton Pumping Plant. At the present time this sandbar has built up to elevation 5913.00; therefore, it may be necessary to dredge the channel in the lake to the inlet of the Lifton Pumping Plant when it is necessary to draw Bear Lake below elevation 5913.00 ft. This study shows that this would occur about once in 12 years. The minimum elevation is based upon the historical record from 1916 to 1970, inclusive. The possibility of going below this elevation does exist but the probability of going below this elevation cannot be obtained from the studies available.

## TABLE I

| MPRE Bear Lake Ft. | Probable Conditions 1 Year in Years | | Minimum Elevation for Probability 1 Year in 55 Years |
|---|---|---|---|
| | Spill Passed Grace | Below Irrigation Reserve | |
| 5919.00 | 4 | 10 | 5910.5 |
| 5918.00 | 5+ | 7- | 5909.5 |
| 5917.00 | 7- | 5- | 5908.5 |
| 5916.00 | 9 | 4- | 5907.2 |
| 5915.00 | 11 | 3+ | 5906.0 |

From Table I. above, the effect can be seen of using other Minimum Release Elevations from 5915.00 to 5919.00 ft. The establishment of 5918.00 Minimum Power Release Elevation indicates a heavy weighting based upon our obligation of meeting irrigation requirements. Without this obligation, a lower MPRE might have been selected. This would have given slightly less exposure of reservoir filling but does increase the exposure of going below the irrigation reserve and also allows the lake to be lower in the one year in 55 minimum elevation probability.