Syllabus.

52　158
21a　564
52　158
124　56
52　158
33a　46
52　158
34a　90
52　158
48a　358

# MICHAEL GORMLEY

## *v.*

# EDWARD SANFORD.

1. SURFACE WATERS—*rights of the servient and dominant heritages.* The owner of a servient heritage has no right, by embankments or other artificial means, to stop the natural flow of the surface water from the dominant heritage, and thus throw it back upon the latter.

2. And it is not perceived that it would follow, as a result of this doctrine, that the owner of the inferior heritage must allow such surface waters to drain, and that he would have no right to use and exhaust them for his own benefit, or to drain them in a different direction.

3. SAME—*application of the rule in cities.* The rule forbidding the owner of the servient heritage to obstruct the natural flow of surface waters, applies as well to city lots as to agricultural lands; though where a city has established an artificial grade and provided an artificial sewerage of which property owners can reasonably avail themselves, it would probably be held to be their duty to do so.

4. SAME—*rights of one whose land does not occupy the position of a servient heritage.* Where adjacent lands, owned by different proprietors, are upon a common level, there being no natural drainage from one to the other by a surface channel, then the land of neither proprietor will occupy the position of a servient heritage, and if an artificial channel should be dug upon one of the lots by the occupant thereof, for his own convenience, by means of which the surface water from the adjacent lot was being carried away, a subsequent owner of the former lot would have the right not only to fill such artificial channel, but to raise his lot above its natural level, if by so doing he does not throw the surface water of his own lot on that of the adjacent proprietor.

5. SAME—*of an artificial drain as an easement upon adjacent land.* Where one of two lots of ground belonging to the same owner, is being occupied by a tenant who dug a ditch thereon for his own convenience, but not at the request or even with the knowledge of the owner, and which incidentally acted as a drain for the surface water of such adjacent lot, a subsequent owner of the latter lot cannot claim such artificial drain as an easement appurtenant to his lot, so as to prevent a subsequent purchaser of the lot upon which it was dug from closing it.

APPEAL from the Circuit Court of Grundy county; the Hon. JOSIAH McROBERTS, Judge, presiding.

The appellant, Gormley, and the appellee, Sanford, owned and occupied adjacent lots in the city of Morris, in Grundy county, in this State. It is claimed by the appellee that the appellant, by artificial means, obstructed the natural flow of the surface waters from the lot of the former upon that of the latter. The principal question presented is, has the owner of the superior or dominant heritage an easement in the servient or lower heritage, for the free and unobstructed flowage, in accustomed natural channels or courses, of the water falling or descending naturally upon his own land? The appellee affirms that he has, and the appellant asserts the negative.

Messrs. S. W. & T. B. HARRIS, for the appellant, cited *Shield* v. *Arndt*, 3 Green Ch. (N. J.) 234; *Luther* v. *Winnisimmet Co.*, 9 Cush. 171; *Ashley* v. *Wolcott*, 11 Cush. 192-5; *Flagg* v. *Worcester*, 13 Gray, 601-7; *Parks* v. *Newburyport*, 10 Gray, 28; *Dickinson* v. *Worcester*, 7 Allen, 19-22; *Gannon* v. *Hargadon*, 10 Allen, 106-9; *Rawstrom* v. *Taylor*, 11 Exch. 369; *Broadbent* v. *Ramsbottom*, 11 Exch. 602; *Bangor* v. *Lansil*, 51 Maine, 521-5; *White* v. *Chapin*, 12 Allen, 518; *Goodale* v. *Tuttle*, 29 N. Y. 459; *Frazier* v. *Brown*, 12 Ohio State R. 298; *Buffom* v. *Harris*, 5 R. I. Reports, 253; *Broadbent* v. *Ramsbottom*, 34 Eng. Law & Eq. R. 553; *Bentz* v. *Armstrong*, 8 Watts & S. 40; *Kaufman* v. *Griesmer*, 26 Penn. St. R. 414.

Mr. B. C. COOK, also for the appellant, argued upon the same authorities, and, in addition, cited Angell on Water Courses (Perkins' ed.), 122.

Messrs. DENT & BLACK, for the appellee.

Water runs, and should run, as it is accustomed to run. This doctrine had its origin in nature, and found its expression in the civil law, whence it was incorporated into the body of our own common law. That the owner of the superior, or dominant heritage, has an easement in the servient or lower land

for the free and unobstructed flowage in accustomed channels or courses of the water falling or descending naturally upon his own land, is not more consonant to nature and its invariable laws than to reason and justice. And this is distinctly maintained in the civil law. Domat, 616, Cushing's ed.; Irskine's Institutes, p. 408; Pardessus (quoted in 26 Penn. p. 413); Code Napoleon, sec. 640.

And the same doctrine has been uniformly held in Louisiana, where the civil code prevails. *Delahoussaye v. Judice,* 13 La. An. 587; *Hooper* v. *Wilkinson,* 15 La. An. 497; *Adams* v. *Harrison,* 4 La. An. 165.

That the same doctrine obtains at common law as to rivers, streams, &c., is not denied. We insist that by the better reason, as well as by the preponderance of authority, this rule extends to surface drainage in all cases where the flow of water, governed, as it always is in a state of nature, by the conformation of the ground, follows a regular and definite course to a natural outlet. Upon this point the authorities are conflicting, but there is no conflict or suspension in the invariable law of nature; and in every case of conflicting authority, the better reason must prevail. In support of this position we refer to Washburn on Easements and S. ch. 3, sec. 6; *Bellows* v. *Sackett,* 15 Barb. 101; *Kaufman* v. *Griesemer,* 26 Penn. 407; *Martin* v. *Riddle,* 26 Penn. 415; *Ashley* v. *Ashley,* 4 Gray, 197; *Overton* v. *Sawyer,* 1 Jones' Law, (N. C.) 308; *Hastings* v. *Livermore,* 7 Gray, 194; *Earle* v. *DeHart,* 1 Beas. Ch. 280; *Laumier* v. *Francis,* 23 Mo. 181; *Bassett* v. *Salisbury Mfg. Co.* 3 Am. L. R. (N. S.) 223; Angell on Water Courses, 214.

Mr. JUSTICE LAWRENCE delivered the opinion of the Court:

This was an action on the case, brought by Sanford against Gormley, for wrongfully obstructing a channel by which, as claimed by plaintiff, his land was drained. Sanford owned certain lots in block 3, in the city of Morris, Grundy county,

numbered 11, 12 and 13, and Gormley owned lots 5, 6 and 7, in the same block, situated south of Sanford's lots, and separated from them by an alley. In May, 1867, Gormley deposited upon the rear part of his lots, near the alley, a quantity of earth, which he had taken from an adjoining coal shaft. At that time Sanford had upon his lots a large number of grape vines which had been planted two years before, about two hundred of which, together with a few young fruit trees, died in the spring of 1867, and he insists, their death was caused by the water thrown back on the rear of his lots by the deposit of earth on Gormley's lots, across which he claims a right of drainage, as being what the civil law terms the lower or servient heritage. The jury found a verdict for the plaintiff, allowing him $1500 damages, and the defendant appealed.

It is admitted that the water which flowed from Sanford's to Gormley's land, the obstruction of which is the basis of the action, is wholly surface water, consisting of rain which fell upon the land itself, or of snow falling and melting there, and much of the argument has been addressed to the question, whether the same law in regard to drainage, which applies to well-defined water courses, is applicable to cases of this character.

This question has already been decided by this court in *Gillham* v. *Madison County R. R. Co.* 49 Ill. 484, not reported, and probably not within the knowledge of counsel, when this case was argued. In the opinion filed in that case, we said, although there was a conflict of authorities among the courts of this country, yet the rule forbidding the owner of the servient heritage to obstruct the natural flow of surface waters, was not only the clear and well settled rule of the civil law, but had been generally adopted in the common law courts, both of this country and of England. Various cases bearing upon each side of the question are cited in that opinion, and it is not necessary to cite them again. This rule was thought by this court, in that cause, to rest upon a sound basis of reason and authority, and was adopted. We find nothing in

11—52ND ILL.

the argument, or authorities presented in the present case, to shake our confidence in the conclusion at which we then arrived. In our judgment, the reasoning which leads to the rule forbidding the owner of a field to overflow an adjoining field by obstructing a natural water course, fed by remote springs, applies, with equal force, to the obstruction of a natural channel through which the surface waters, derived from the rain or snow falling on such field, are wont to flow. What difference does it make, in principle, whether the water comes directly upon the field from the clouds above, or has fallen upon remote hills, and comes thence in a running stream upon the surface, or rises in a spring upon the upper field and flows upon the lower? The cases asserting a different rule for surface waters and running streams, furnish no satisfactory reason for the distinction. It is suggested in the argument, if the owner of the superior heritage has a right to have his surface waters drain upon the inferior, it would follow that he must allow them so to drain, and would have no right to use and exhaust them for his own benefit, or to drain them in a different direction. We do not perceive why this result should follow. The right of the owner of the superior heritage to drainage is based simply on the principle that nature has ordained such drainage, and it is but plain and natural justice that the individual ownership arising from social laws should be held in accordance with pre-existing laws and arrangements of nature. As water must flow, and some rule in regard to it must be established where land is held under the artificial titles created by human law, there can clearly be no other rule at once so equitable and so easy of application as that which enforces natural laws. There is no surprise or hardship in this, for each successive owner takes with whatever advantages or inconveniences nature has stamped upon his land. We find no error in the instructions of the court upon this branch of the case.

It is urged, however, that this rule, even if justly applicable to agricultural lands, should not be applied to city lots. Where

a city has established an artificial grade, and provided an artificial sewerage, of which property owners can reasonably avail themselves, we should probably hold it their duty to do so, and so the court substantially instructed in the present case. But this was not the state of facts in reference to this property, so far as disclosed by this record. The lots lie in a very thinly populated addition to the city of Morris, and those belonging to plaintiff were used for the purpose of fruit growing, while defendant mined coal upon his.

While, however, the court gave the law correctly to the jury in regard to superior and servient heritages, it committed an error in the modification of the fourth and fifth of defendant's instructions, which, in the conflicting state of the evidence, may have had a potent influence upon the jury in arriving at their verdict. The plaintiff insisted the water was drained from the rear of his lots to the rear of the defendant's lots by a natural channel. This was denied by the defendant, who insisted that his own and the rear of plaintiff's lots were on the same level, or so nearly so, that there was no drainage by any natural channel upon the surface, and that whatever drainage, in fact, existed, was by means of artificial ditching. It was clearly proved that one Rogan, who occupied the Gormley lots in 1859, dug two ditches across these lots in that year— one from the north line to the south, and one from the northeast to the southwest corner of the lots. At that time, the Sanford lots on the north were open prairie, and the rear of these lots, and the Gormley lots, were low, wet land. Rogan testifies he ditched to save what he planted. It is further shown that Sanford, after he bought his lots, drained them to a greater or less degree by means of dead furrows, and that the water thus collected passed off through a ditch across the alley. We are expressing no opinion as to the existence of a natural channel, but merely stating the proof in regard to the artificial ditching, for the purpose of showing the propriety of these instructions as asked, and the materiality of the court's amendments.

The instructions, as asked by the defendant, were as follows:

" 4. If the jury believe that the south end of Sanford's lots, as the ground naturally stood along the alley in question, was lower than the original surface of the alley, so that the surface waters shed there from heavy rains did not all drain off, but was carried off by artificial ditches through defendant's lots, dug by a person in possession therof for his own convenience, the defendant had a right to fill up the ditches, the law being that one owner of land is not obliged either to open or keep open artificial ditches below the natural surface of his own land for the purpose of draining the low lands of his neighbor.

" 5. If the jury believe, from the evidence, that nearly the entire surface of the plaintiff's lots, in their natural condition, was wet and swampy, caused by the water percolating or soaking from ponds above them, or from any cause; that a portion of the lots descended towards the defendant's lots; that the lower ends of the plaintiff's lots, and the alley and the adjoining ends of the defendant's lots, were nearly or quite on a level, and were also wet and swampy, caused by the percolation or soaking of the water from the upper portion of the plaintiff's lots; and if the jury further believe, from the evidence, that across the defendant's lots artificial ditches were dug below the natural surface for the accommodation of the possessor thereof; then the defendant had a right to fill up those artificial ditches, the law being that the owner of land is not obliged to open or keep open artificial drains for the purpose of draining the low and swampy lands of another."

The first of these instructions the court qualified by adding after these words, " the defendant had a right to fill up the ditches," this clause: " but not above the natural surface where they were dug." The second was qualified by inserting a similar clause. These qualifications amounted, in effect, to an instruction that the defendant could not fill ditches upon his own land dug by a former occupant for his own convenience, and

raise his lots above their natural level, even though there was no drainage by a natural channel from the plaintiff's lots to his own. Now, if the rear of the plaintiff's ground and the lots of defendant were flat and wet, and on a common level, there being no natural drainage by a surface channel, which was the hypothesis of the instructions, then the defendant's lots did not occupy the position of a servient heritage, and he had the right, not only to fill the artificial ditch, but to raise the natural surface, if in so doing he did not throw the surface water of his own lot on that of the plaintiff. The defendant did undoubtedly fill a part of his ground above the natural surface, but it was close upon the alley, and there is no pretense that he thereby threw the water falling on his own land upon that of the plaintiff to an extent capable of producing any injury. This is not claimed by plaintiff's counsel, and indeed the plaintiff himself testifies that the filling near the edge of the alley seemed higher than that on other portions of the lot. This would have the effect of throwing the surface water of the defendant away from plaintiff's lots.

This qualification of the defendant's instructions may well have misled the jury, as it told them the defendant had no right to do what he clearly had done, and what he had a clear right to do.

It is urged by plaintiff's counsel that even if plaintiff's lots were artificially drained, yet as the ditch upon defendant's lots was dug by Rogan at a time when both these lots and those of plaintiff belonged to Goold, and Goold sold first to Sanford and afterwards to Gormley, the ditch remaining open and in use, and being necessary for the cultivation of Sanford's lots, it became an easement appurtenant thereto, and could not be closed against the will of their owner. It is unnecessary to decide the question sought to be raised, as the proof shows the ditch on the Gormley lots was dug by Rogan for his own benefit as tenant, and not for the purpose of draining the Sanford lots, which were then uninclosed, or with any reference

thereto, and there is no evidence that it was done at the request or even with the knowledge of the then owner. So far as the Sanford lots were benefited thereby, such benefit was simply accidental. Under such circumstances, there is no ground for claiming a continuance of this ditch as appurtenant to the plaintiff's lots.

For the error above indicated the judgment must be reversed and the cause remanded.

*Judgment reversed.*