# IN THE SUPREME COURT OF THE STATE OF IDAHO
## Docket No. 46675

LORA K. ROBERTS, an individual, )
)
    Plaintiff-Appellant, )
)     **Boise, January 2020 Term**
)
v. )
)     **Opinion Filed: July 30, 2020**
)
THOMAS JENSEN and DEANNA JENSEN, )
husband and wife, )     **Melanie Gagnepain, Clerk**
)
    Defendants-Respondents. )

Appeal from the District Court of the Fifth Judicial District, State of Idaho, Jerome County. John K. Butler, District Judge.

The judgment of the district court is <u>affirmed</u>.

Barker Rosholt & Simpson LLP, Twin Falls, for appellant Lora K. Roberts. Travis Lee Thompson argued.

Holden, Kidwell, Hahn & Crapo, P.L.L.C., Idaho Falls, for respondents Thomas and Deanna Jensen. D. Andrew Rawlings argued.

_____

STEGNER, Justice.

This is a case involving a waste ditch that drained surface water from property owned by Lora Roberts (Roberts) through property owned by Thomas and Deanna Jensen (the Jensens). The ditch itself passed through a man-made culvert under a county road between the properties. The Jensens filled in the portion of the waste ditch located on their property in 2013. In February 2017, Roberts' property experienced significant flooding. The flooding damaged her home as well as horse feed stored in the barn. It also forced her to relocate her horses from her property.

Roberts filed an action against the Jensens, alleging trespass and nuisance, as well as seeking a declaratory judgment to establish that Roberts had an interest in the waste ditch on the Jensens' property as an easement on the basis that the ditch was an established natural servitude. After lengthy motion practice between the parties, the district court granted the Jensens' motion for summary judgment against Roberts, and denied Roberts' motion for summary judgment. Prior to rendering its ultimate decision, the district court struck portions of several affidavits presented

1

by both Roberts and the Jensens, in particular the opinions of both parties' experts. The district court also held that the ditch on the Jensens' property was not a "natural servitude" because (1) the ditch was an "artificial channel," not a natural watercourse; and (2) notwithstanding the way Roberts' property had originally drained, the development of the county road and installation of the culvert obstructed this drainage, causing the periodic flooding. The district court dismissed the trespass claim because there was no intrusion or invasion by the Jensens onto Roberts' property. The district court also dismissed the nuisance claim because the flooding was not caused by a natural servitude, and therefore a nuisance action was not applicable. The district court then denied Roberts' request for a declaratory judgment. Roberts moved unsuccessfully for reconsideration, and her timely appeal followed. For the reasons below, we affirm the district court's order granting summary judgment against Roberts.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

### A. Factual background.

The Sunnyside Acres Subdivision was platted in Jerome County, Idaho, in 1978. The plat shows a ten-foot easement for a waste ditch entering the subdivision, cutting through Lots 4 and 5, across a proposed county road, and traversing through Lots 33, 34, and 35, before reaching a second county road. (An enlargement of the plat showing the parties' properties is attached to this opinion as Exhibit A.) The ditch easement evidently existed at the time the plat was recorded, having been reserved as a "temporary irrigation easement" for the benefit of a farm, known as the Van Beek Farm, northeast of the Sunnyside Acres Subdivision.[1] There is further indication that the ditch flowed under the second county road, and then ended on the edge of a field in another farm. At least one affidavit attested that the water that drained from the ditch eventually reached the Snake River Canyon.

Both Roberts and the Jensens reside in the Sunnyside Acres Subdivision. Roberts purchased her property in 2001. She owns the property labeled Lot 5 on the plat. The Jensens purchased their property in May 2010. The Jensens own the property labeled Lot 35.

---

[1] The Jensens provided as an exhibit the warranty deed received by Roberts which refers to the ditch as a "temporary easement . . . for farm irrigation" that would be removed when Lots 3–6 within the Sunnyside Acres Subdivision were developed. There is no conflicting evidence in the record suggesting that the ditch was *not* an easement reserved to Van Beek Farm at that time. It also appears from the record that by the time Roberts bought her property, Lot 5, the easement itself had been removed from it.

By the time Roberts purchased Lot 5 in 2001, the waste ditch on her property had been "largely obliterated by the horses that grazed on the property." According to Roberts, she "smoothed the ditch area out with [her] small tractor and horse arena groomer, and created a visible swale[.]" Roberts contends that this swale allowed "naturally occurring rainfall and snowmelt . . . to pass from the properties above" hers. Only twice between 2001 and 2010 did flooding occur on Roberts' property. Roberts contends that flooding during these previous events never reached the barn, corrals, or the crawlspace of her home. These events were caused by melting snow and rainfall, and floodwater "remained until it overtopped Sunnyside Drive, and was then discharged and conveyed southwesterly through the ditch on" Lot 35. According to Roberts, the maximum depth of floodwater over Sunnyside Drive was about four inches.

When the Jensens bought Lot 35 in May 2010, the ditch still existed on their property. The ditch occasionally would flow with water "in the rare instances of a large storm or rapid snow melt." However, the Jensens contend "[t]here was never a regular flow of water through" the ditch. In June 2013, after consulting with the Jerome County Planning and Zoning Office, the Jensens filled in the ditch located on their property. The Jensens contend that in doing so they "did not increase the grade, gradient, elevation, or level of" their property, "or alter its grade[.]"

While the Jensens were filling in the ditch in June 2013, Roberts came to the Jensens' property to complain that the ditch was being filled. Roberts told the Jensens that they could not fill in the ditch. The Jensens refused to comply and finished filling the ditch. There is no indication from the record that there was any flooding between June 2013 and February 2017.

In February 2017, temperatures increased suddenly while there was still a significant amount of snow on the ground and while the ground was still frozen. As a result of the related precipitation and melting, severe flooding occurred throughout south central Idaho, triggering emergency declarations by the Idaho governor and the federal government.

Roberts' property was severely flooded during the events of February 2017. Water was unable to escape through the culvert under Sunnyside Drive and the ditch on the Jensens' property that had now been filled in. It pooled, flooding Roberts' barn, corrals, and the crawlspace of Roberts' home. The depth of water over Sunnyside Drive was at least eighteen inches deep, and spread along Sunnyside Drive "for a distance of approximately 200 feet." According to Roberts, water was unable to leave Roberts' property for almost two weeks until the ground began to thaw

and could absorb the water. The flooding destroyed hay stored in Roberts' barn, and she was forced to remove her horses from the property.

## B. Procedural history.

On February 18, 2018, Roberts filed suit, alleging trespass and nuisance, and seeking damages and a declaratory judgment that Roberts had an easement across the Jensens' property. Her amended complaint was filed June 5, 2018, in which Roberts clarified that she was seeking a declaratory judgment establishing the validity of the natural servitude or easement on the Jensens' property. Roberts then filed a motion for summary judgment on June 22, 2018. She also filed affidavits from the following: Mark Dekruyf (Dekruyf), a friend of Roberts who attested to the flooding in 2017; Larry Bos (Bos), the son of a farmer who farmed the property that would become Sunnyside Acres; John Root, the land surveyor who prepared the plat for Sunnyside Acres; Dr. Charles Brockway (Brockway), an expert who reviewed a survey of the subdivision plat and the ditch easement area; Douglas Schwarz (Schwarz), the employee of an engineering firm who conducted the survey of the subdivision plat and ditch easement area; and herself. In particular, Brockway provided a drainage evaluation based on raw survey data and topographic ground contours, concluding that when the Jensens filled the ditch, they increased the elevation to which water needed to rise on Roberts' property before water would drain. This was modeled at various cubic feet per second (cfs), showing an increase in water elevation of between 0.27 feet and 0.89 feet. This model also estimated that the culvert was approximately 50% blocked. The Jensens opposed Roberts' motion for summary judgment, and filed a motion to strike the affidavits.

On July 30, 2018, the Jensens filed a cross-motion for summary judgment. Counsel for the Jensens also filed a declaration including several documents produced in discovery. In addition, the Jensens filed the declaration of their own expert, Dr. Ryan Christensen (Christensen). Roberts opposed the Jensens' motion for summary judgment, and filed a cross-motion to strike a portion of the declaration filed by counsel for the Jensens and the declaration of Christensen.

On August 27, 2018, the district court conducted a hearing on the pending motions. Roberts argued that the undisputed facts established trespass and nuisance and entitled her to declaratory relief establishing the natural servitude. Roberts argued that the ditch qualified as an easement, as acknowledged by the plat, and that Roberts' property was the dominant estate. Roberts also argued that the ditch was at the very least a natural servitude because it was a drainage for discharging surface water and wastewater from the basin.

4

In response, the Jensens asserted that the question of the case was "whether the waste ditch is a natural servitude or . . . a typical ditch." The Jensens argued that a natural servitude did not exist anymore, if ever, because the ditch had been dug to drain water off further than the natural low point at the bottom of Roberts' property, making the ditch beyond this point "artificial." The Jensens contended that the requirements for a natural servitude were not met because the waste ditch was not a natural watercourse that discharged itself into another stream or body of water. The Jensens further argued that if there was an easement in the ditch, the dominant estate was the Van Beek Farm, not Roberts' property.

The district court entered a decision denying Roberts' motion for summary judgment, and granting the Jensens' motions for summary judgment. In rendering its decision, the district court struck several portions of affidavits and exhibits that accompanied Roberts' motion for summary judgment. The district court struck the opinions of the experts retained by both Roberts and the Jensens, observing that the experts had not provided information about the

> amount of snow accumulation and rain that had occurred in February, 2017 [sic] and the amount of water generated by the rain and rapid snow melt. The experts have not analyzed the ability of the culvert to pass water through it based on the sedimentation in the culvert as well as the restricted openings of the culvert at each end of the culvert. The experts have not calculated the cubic feet per second (cfs) that the culvert could accommodate in its condition as it existed at the time of the flooding event.

Accordingly, the district court found that the experts' opinions were speculative and did "not assist the trier of fact . . . when the evidence indicates that the culvert under Sunnyside Drive is unable to adequately convey water off of the Roberts' property when there is excessive rain fall [sic] or snow or snow melt."

Having struck the opinions of both parties' experts, the district court then proceeded to address the parties' legal theories. The district court first held that the ditch on the Jensens' property was not a "natural servitude" because (1) the waste ditch had been "essentially 'obliterated[,]'" (2) the development of the county road altered the natural drainage of Roberts' property, and (3) the ditch was an "artificial channel" obstructed by the road and culvert. The district court then dismissed the trespass claim, reasoning that there was no intrusion or invasion by the Jensens onto Roberts' property. The district court also dismissed the nuisance claim, stating that (1) the ditch was intended to convey waste water, not to convey surface water; (2) the ditch was not sufficient to carry all of the surface water run-off from Roberts' property; (3) Roberts had

no interest in the ditch itself to challenge the Jensens' filling of the ditch; and (4) the flooding on Roberts' property was caused by the condition of the "artificial channel." Finally, the district court denied Roberts' request for a declaratory judgment that Roberts was the dominant estate in the platted ditch easement.

Roberts moved for reconsideration of the district court's dismissal of her causes of action for nuisance and declaratory relief. Roberts first argued that although the ditch was not sufficient to carry *all* surface water from her property, a nuisance was nonetheless created when the Jensens blocked the ditch, increasing the ponding and causing the flood damage that did occur. Roberts then argued that a natural servitude did exist even though the ditch was not a natural watercourse. Roberts contended that the Jensens created a "dam" constituting "an impediment to the natural servitude[.]"

On November 30, 2018, the district court denied Roberts' motion for reconsideration. The district court reiterated that the ditch was not a natural servitude because the ditch was an artificial channel, and that Roberts could not proceed against the Jensens under a claim of trespass or nuisance. Instead, Roberts was limited to a negligence claim against the Jensens, and had not properly pleaded this cause of action. The district court observed that it was "clear from the evidence presented that the condition of the culvert under Sunnyside Drive is a substantial factor in the reduction of the flow of water from [Roberts'] property to the [Jensens'] property." Turning to the issue of the ditch as an easement, the district court stated that Roberts had "presented no evidence that she is the owner of the waste ditch easement." Accordingly, the district court denied Roberts' motion for reconsideration. Roberts timely appealed.

## II.     STANDARD OF REVIEW

"When reviewing a grant of summary judgment, this Court employs the same standard as the district court." *Fischer v. Croston*, 163 Idaho 331, 335, 413 P.3d 731, 735 (2018) (quoting *Idaho Youth Ranch, Inc. v. Ada Cty. Bd. of Equalization*, 157 Idaho 180, 182, 335 P.3d 25, 27 (2014)). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." I.R.C.P. 56(a).

> "The fact that the parties have filed cross-motions for summary judgment does not change the applicable standard of review." *Shawver v. Huckleberry Estates, L.L.C.*, 140 Idaho 354, 360, 93 P.3d 685, 691 (2004). . . . "The facts must be liberally construed in favor of the non-moving party." *Capstar Radio Operating Co. v. Lawrence*, 153 Idaho 411, 416, 283 P.3d 728, 733 (2012). When both parties move for summary judgment, "the [district] court as the trier of fact is entitled to

arrive at the most probable inferences based upon the undisputed evidence properly before it and grant the summary judgment despite the possibility of conflicting inferences." *Huckleberry Estates, L.L.C.*, 140 Idaho at 361, 93 P.3d at 692. "The test for reviewing the inferences drawn by the [district] court is whether the record reasonably supports the inferences." *Beus v. Beus*, 151 Idaho 235, 238, 254 P.3d 1231, 1234 (2011).

*Tiller White, LLC v. Canyon Outdoor Media, LLC*, 160 Idaho 417, 419, 374 P.3d 580, 582 (2016).

"[W]hen reviewing a [district] court's decision to grant or deny a motion for reconsideration, this Court utilizes the same standard of review used by the lower court in deciding the motion for reconsideration." *Fragnella v. Petrovich*, 153 Idaho 266, 276, 281 P.3d 103, 113 (2012). Therefore, "when reviewing the grant or denial of a motion for reconsideration following the grant of summary judgment, this Court must determine whether the evidence presented a genuine issue of material fact to defeat summary judgment." *Id.* Further, "it is well-settled that '[w]here an order of a lower court is correct, but based on an erroneous theory, the order will be affirmed upon the correct theory.'" *Kuhn v. Coldwell Banker Landmark, Inc.*, 150 Idaho 240, 248, 245 P.3d 992, 1000 (2010) (alteration in original) (quoting *Andre v. Morrow*, 106 Idaho 455, 459, 680 P.2d 1355, 1359 (1984)).

This Court reviews a district court's evidentiary ruling, including the admission of expert opinion testimony, for an abuse of discretion. *Hull v. Giesler*, 163 Idaho 247, 250, 409 P.3d 827, 830 (2018) (citation omitted). This standard of review requires an inquiry asking "[w]hether the [district] court: (1) correctly perceived the issue as one of discretion; (2) acted within the outer boundaries of its discretion; (3) acted consistently with the legal standards applicable to the specific choices available to it; and (4) reached its decision by the exercise of reason." *Lunneborg v. My Fun Life*, 163 Idaho 856, 863, 421 P.3d 187, 194 (2018) (citation omitted).

## III. ANALYSIS

### A. The district court did not err in granting summary judgment to the Jensens because Roberts failed to proffer evidence that a natural servitude existed prior to the creation of the ditch.

The district court held that the doctrine of natural servitude did not apply, providing several reasons in its decisions on summary judgment and reconsideration. These included: (1) the original use of the ditch was to dispose of unused irrigation water or wastewater; (2) the doctrine of natural servitude applies only to the conveyance of surface water, not wastewater; (3) the ditch was an "artificial channel," not a natural watercourse; and (4) the culvert and county road constitute an "artificial structure" obstructing the natural drainage of water from Roberts' property.

7

On appeal, Roberts argues that the district court confused the elements of the rule of natural servitude with the elements of the "natural watercourse." Roberts also asserts that although the ditch no longer carried irrigation wastewater when she purchased her property, the ditch on the Jensens' property continued to carry surface water run-off between 2001 and 2013, until the Jensens filled in the ditch. Roberts argues that the natural watercourse exception is not implicated because she (1) did not install the county road or culvert; (2) did not divert, concentrate, or direct the surface water run-off; and (3) does not "discharge" water onto the Jensens' property through the culvert. Roberts also argues that the limited flooding that did occur before the Jensens filled in the ditch on their property, as well as the existence of the culvert, does not enable the Jensens to destroy the natural servitude.

In response, the Jensens argue that the waste ditch was an artificial, man-made channel, not a natural drainage, and is therefore not subject to the rule of natural servitude, arguing that "a natural servitude by itself does not allow an upper landowner to protect any artificial drainage on lower land." The Jensens distinguish between natural drainage and an *artificial* channel, arguing that the waste ditch is the latter. The Jensens assert that Roberts has not established that the waste ditch is a natural watercourse. The Jensens further argue that the "numerous man-made and artificial interferences" with the ditch eliminated any interest Roberts could claim in the ditch as a natural servitude. The Jensens further assert that this Court can affirm the district court's grant of summary judgment on the alternate affirmative defense that the flooding in 2017 constituted an "Act of God."

Roberts counters, arguing that the Jensens misinterpret "natural" to mean the "character of the" feature, here the ditch, rather than the source of the water the ditch conveys. Roberts argues that the "artificial ditch feature" did not cut off the natural servitude after the county road and culvert were completed. Roberts finally contends that establishing a natural servitude does not require establishing that a natural watercourse exists. Further, Roberts asserts that the "Act of God" affirmative defense is inapplicable because the Jensens filled in the ditch in 2013, and that at the very least genuine issues of material fact exist as to whether this defense absolves the Jensens entirely from liability for the damage Roberts sustained.

Idaho's jurisprudence "adheres to the civil law rule[2] . . . which recognizes a natural servitude of natural drainage between adjoining lands so that the lower owner must accept the 'surface water' which naturally drains onto his land." *Lemhi Cty. v. Moulton*, 163 Idaho 404, 411, 414 P.3d 226, 233 (2018) (omission in original) (quoting *Dayley v. City of Burley*, 96 Idaho 101, 103, 524 P.2d 1073, 1075 (1974)). "[T]his servitude which is placed upon a lower landowner requires the landowner to bear the burden of natural drainage waters," but "this servitude cannot be augmented or made more burdensome by the upper landowner." *Burgess v. Salmon River Canal Co.*, 119 Idaho 299, 305, 805 P.2d 1223, 1229 (1991) (citing *Loosli v. Heseman*, 66 Idaho 469, 477, 162 P.2d 393, 397 (1945)). "Thus, the upper landowner cannot artificially accumulate the water only to release it upon the lower landowner in an unnatural concentration." *Id.* (citing *Teeter v. Nampa & Meridian Irrigation Dist.*, 19 Idaho 355, 114 P. 8 (1911)).

While an easement is a kind of servitude, a *natural* servitude is not the same as an easement. *See generally Lemhi Cty.*, 163 Idaho at 411, 414 P.3d at 233 (affirming district court's separate findings of a natural servitude and an easement); *Duenow v. Lindeman*, 27 N.W.2d 421, 427 (Minn. 1947) ("A natural right to drainage of surface waters from upper land over and across lower land is not man-made in the sense that it is the result of any act of the landowners, but springs from the fact that the law has adopted as the rights and duties of the parties the natural easements and servitudes which nature itself has imposed upon the lands by placing them in their respective positions.").

A natural servitude conveys rights and duties that can be asserted by both the upper and lower landowners: the upper landowner may compel the lower to accept the natural drainage, and the lower landowner may limit the upper landowner's ability to artificially accumulate and discharge water that increases the burden on the lower landowner. *See, e.g.*, *Loosli*, 66 Idaho at 472–73, 162 P.2d at 394–95 (asserted by upper landowners); *Teeter*, 19 Idaho at 358, 114 P. at 8 (asserted by lower landowners).

Until today, this Court has not clearly defined "natural drainage" as used in its explanation of the rule of natural servitude. We found a natural servitude in *Lemhi County* where a "natural draw" was fed by a diversion from an up-gradient creek; in that case this Court rejected the

---

[2] This is a theory diametrically opposed to the "common enemy." The "common enemy" theory gives "each landowner . . . an unqualified right, by operations on his own land, to fend off surface waters as he sees fit without being required to take into account the consequences to other landowners[.]" Janet Fairchild, Annotation, *Modern Status of Rules Governing Interference with Drainage of Surface Waters*, 93 A.L.R.3d 1193 § 3 (Originally published in 1979).

argument that a natural servitude should be "limited to naturally occurring surface water," and should not "include irrigation water, wastewater, or other accumulated diverted water." *Lemhi Cty.*, 163 Idaho at 410, 414 P.3d at 232. Further, we have found that the natural flow of water from higher to lower elevations can give rise to "natural drains" or "natural channels." *See Utter v. Gibbins*, 137 Idaho 361, 366, 48 P.3d 1250, 1254 (2002); *Langley v. Deshazer*, 78 Idaho 376, 378, 304 P.2d 1104, 1105 (1956); *Smith v. King Creek Grazing Ass'n*, 105 Idaho 644, 646, 671 P.2d 1107, 1109 (Ct. App. 1983). Conversely, we have not found a natural servitude merely where there was a "depression or swale" into or through which no "water resulting from natural causes flowed." *Loosli*, 66 Idaho at 481, 162 P.2d at 399.

Several definitions of "natural" suggest that "natural drainage" excludes man-made drainage systems. Merriam-Webster's Collegiate Dictionary provides several definitions, including "being in accordance with or determined by nature," "having or constituting a classification based on features existing in nature," and "existing in or produced by nature: not artificial." *Natural*, Merriam-Webster's Collegiate Dictionary 826 (11th ed. 2007).

The principles underlying the rule of natural servitude suggest that it does not apply to drainage provided by man-made features:

> The "civil law" rule is based upon a principle expressed in the ancient maxim *aqua currit et debet currere, ut currere solebat*—water flows and should be allowed to flow, in its natural channel. This principle is anchored by philosophical and pragmatic values. Philosophically, it reflects a view that man's best interests are served by retaining nature's system of watersheds. Pragmatically, it promotes stability in land use arrangements, and minimizes surprise, by conforming man-made law as closely as possible to the enduring law of nature. It permits each landowner to ascertain the burdens of natural water drainage in the watershed serving his area, and to act accordingly. "[E]ach successive owner takes with whatever advantages or inconveniences nature has stamped upon his land."

Donald L. Burnett, Jr., *Surface Water and Nuisance Law: A Proposed Synthesis*, 20 IDAHO L. REV. 185, 193 (1984) (alteration in original) (quoting *Gormley v. Sanford*, 52 Ill. 158, 162 (1869)). Accordingly, a natural servitude requires natural *features*, i.e., the "advantages or inconveniences *nature* has stamped on [the] land." *Id.* (italics added).

On the other hand, at least two states applying the "civil law" or some variant of it have found that an artificial ditch can constitute some kind of natural drainway. *See, e.g.*, *Sheker v. Machovec*, 110 N.W. 1055, 1056 (Iowa 1907) (natural water course or depression found when tile drain ran "along a swale or natural depression"); *Gruber v. Cty. of Dawson*, 439 N.W.2d 446, 452

(Neb. 1989) (natural drainageway in man-made ditch where "[e]ven after construction of the ditch, water was nevertheless carried across the property from the same entrance to the same exit"); *but see Leidlein v. Meyer*, 55 N.W. 367, 368–69 (Mich. 1893) (evidence supported finding that ditch was *either* a natural servitude, or an artificial watercourse through which upper landowner had gained an easement by prescription where original channel had been widened, deepened, and then used for more than thirty years). In these cases, the key fact appears to be that the artificial drainage feature *followed* an original natural channel, or that the artificial element was not an "essential part" of the drainageway. *See Gruber*, 439 N.W.2d at 452.

Notwithstanding these exceptions, we hold that a party seeking to establish that a natural servitude exists must prove by a preponderance of the evidence that naturally occurring water drains through natural features as opposed to those that are man-made.[3] A natural servitude does not lose its character simply because it is further developed by human intervention, but it must first be determined to be a natural servitude.[4]

However, the question in *this* case becomes whether there is a genuine question of material fact regarding the existence of a natural servitude. We conclude that there is no genuine issue of material fact as to what predated the ditch in this case. On appeal, Roberts has argued that it is the work of gravity on surface water alone that makes the ditch a "natural drainage." She has argued that the character of the land does not determine whether a natural servitude exists, stating that "'[n]atural' concerns the source of the water, not the character of the land." She has conceded the lack of evidence to show what the "natural state" of the property was prior to the property's irrigated agricultural or subdivision development. This concession is fatal to her claim. Absent proof of what preceded the ditch, there is a lack of proof of a "natural servitude."

---

[3] In contrast, we have required easements by prescription to be established by clear and convincing evidence. *Backman v. Lawrence*, 147 Idaho 390, 396, 210 P.3d 75, 81 (2009) (citation omitted). However, easements that are created by human action are inherently different from natural servitudes, which exist because of the natural lay of the land. *See H.F.L.P., LLC v. City of Twin Falls*, 157 Idaho 672, 679, 339 P.3d 557, 564 (2014) ("Idaho law disfavors private prescriptive easements.").

[4] The dissent characterizes this holding as a departure from "over a century of Idaho case law" about what "natural" means in the phrase "natural servitude." This characterization fails to recognize that "natural" simply refers to the "lay of the land" as it existed *prior* to human intervention. Man-made—"unnatural"—changes to terrain will not result in the *creation* of a natural servitude, but if a natural servitude already exists, further development along the natural drain way will not eradicate it. Contrary to the dissent's view that this decision somehow undoes "a century of Idaho case law," this decision merely concludes Roberts failed to establish the facts necessary for her case to proceed. Without facts to establish a pre-existing natural drainage, the filling of the man-made waste ditch by the Jensens did not somehow destroy a "natural servitude."

In addition, the evidence in the record reveals nothing about what predated the ditch. While Roberts submitted affidavits from multiple sources, including the expert witness opinion, only the affidavits of Larry Bos (neighbor and farmer) and John Root (surveyor) can be remotely read to speak about the state of the property before the ditch was created. According to Bos, his family farmed the land that would become the subdivision; he stated that he knew the lay of the property, and that water "ran to the low point on the property." This testimony does not support Roberts' claim. It is so generic as to be unhelpful. Bos' affidavit does not mention the ditch, even though the record is clear that the ditch existed during his childhood and at the time of the subdivision's creation. Likewise, Root set the pins for the lot corners of the subdivision, and expressed that it was "apparent that the location of the ditch is the natural drainage that allowed rain or snowmelt to drain through the property[.]" There is no indication that Bos' and Root's affidavits were referring to the land prior to the *ditch's creation*, given the ditch already existed when the subdivision was created. Roberts has not attempted to establish when the waste ditch was created or what the land looked like prior to its creation. "[A] mere scintilla of evidence or only slight doubt as to the facts" does not establish a genuine issue of material fact. *See Brown v. City of Pocatello*, 148 Idaho 802, 806, 229 P.3d 1164, 1168 (2010) (alteration in original) (quotation omitted).

Despite the dissent's reliance on Brockway's statement that "[a] natural drainage way exists . . . . follow[ing] a northeast to southwest alignment within an easement[,]" the opinion does not describe what predated the waste ditch, nor does it create a genuine issue of material fact barring summary judgment. Brockway opined about the waste ditch *itself* before and after the Jensens filled it in, basing his opinion on a present-day topographical survey and rainfall data, and acknowledged that the "drainage way" was encompassed "within an easement." Brockway did not offer an opinion about the *pre-existing* lay of the land before the waste ditch was developed.

Summary judgment was appropriate here because of Roberts' failure to establish a genuine question of material fact. The existence of a natural servitude turns on what, if anything, predated the ditch, and Roberts has not argued, much less presented evidence, that the waste ditch was developed following a natural servitude. In addition, the remedy sought by Roberts was a declaratory judgment, which means the fact-finder at trial would be the district court. The parties also agreed that the district court would be the fact-finder at trial. As a result, at summary judgment, the district court was entitled to draw the most probable inferences from any disputed facts in the

12

case. *See Tiller White, LLC*, 160 Idaho at 419, 374 P.3d at 582. One of the bases upon which the district court granted summary judgment was that the ditch was an "artificial channel" and not a natural watercourse. Because Roberts failed to present evidence creating a genuine issue of fact as to this conclusion, her claim to a natural servitude fails. We conclude that summary judgment against Roberts was appropriate because there is no evidence in the record establishing a genuine issue of material fact as to what predated the man-made ditch, and therefore the existence of a natural servitude. Even if Roberts had presented evidence creating doubt as to the facts because of conflicting inferences, the district court was entitled to draw the most probable inferences.

Because we affirm summary judgment on this basis, we need not address the other issues raised in Roberts' appeal or the Jensens' cross-appeal.

### B. The district court did not err as a matter of law in dismissing Roberts' nuisance and trespass claims.

Roberts also brought claims for nuisance and trespass. The district court dismissed her nuisance claim, concluding that because the ditch was not a natural servitude, Roberts could not bring a nuisance or trespass claim. *See Kunz v. Utah Power & Light Co.*, 117 Idaho 901, 906, 792 P.2d 926, 931 (1990). In *Kunz*, this Court held that where an artificial channel is involved, an injured landowner may only seek recourse under negligence-based causes of action, and cannot bring nuisance or trespass claims. *Id.* at 903–04, 792 P.2d at 928–29. Accordingly, because Roberts did not establish a genuine issue of material fact as to the existence of a natural servitude, the district court correctly dismissed Roberts' nuisance and trespass claims. *See id.* at 905, 792 P.2d at 930.

### IV. CONCLUSION

The district court did not err in granting summary judgment against Roberts because there is no genuine issue of material fact with respect to the existence of a natural servitude. The district court also did not err when it dismissed Roberts' trespass and nuisance claims. Accordingly, we affirm the district court's order granting summary judgment against Roberts.

Costs are awarded to the Jensens on appeal as the prevailing party.

Chief Justice BURDICK and Justice BRODY CONCUR.


MOELLER, J., dissenting.

I respectfully dissent from the conclusion of the Majority's otherwise well-reasoned and thoughtful opinion. The Majority characterizes the central issue of this case as follows:

13

the question in this case becomes whether there is a genuine question of material fact regarding the existence of a natural servitude. We conclude that there is no genuine issue of material fact as to what predated the ditch in this case. On appeal, Roberts has argued that it is the work of gravity on surface water that makes the ditch a "natural drainage." She has argued that the character of the land does not determine whether a natural servitude exists, stating that "'[n]atural' concerns the source of the water, not the character of the land." She has conceded the lack of evidence to show what the "natural state" of the property was prior to the property's irrigated agricultural or subdivision development. This concession is fatal to her claim. Absent proof of what preceded the ditch, there is a lack of proof of a "natural servitude."

Conducting its de novo review of the record, the Majority affirms the district court's order granting summary judgment to Jensen because "the evidence in the record reveals nothing about what predated the ditch." While I acknowledge that that there is not an abundance of evidence characterizing the condition of the land over the many years before it was developed, the evidence in the record cannot be fairly described as "nothing." Indeed, it should more properly characterized as significantly "more than a mere scintilla." *Venable v. Internet Auto Rent & Sales, Inc*., 156 Idaho 574, 585, 329 P.3d 356, 367 (2014).

The district court, in granting summary judgment, made a finding that "[t]he development of Sunnyside Drive has altered the natural drainage of the property." It is difficult to understand why such a finding would not preclude summary dismissal of the case. Regardless, there was ample evidence in the record to support this finding. For example, attached to the Supplemental Affidavit of Dr. Charles Brockway is his "Drainage Evaluation and Hydraulic Modeling on Sunnyside Acres Subdivision." The report begins with a statement that has gone largely unchallenged:

A natural drainage way exists within Sunnyside Acres Subdivision in Jerome County, Idaho. The drainage follows a northeast to southwest alignment within an easement recorded on the subdivision plat, running through Lots 5 Block 1 (Roberts property), Lot 35 Block 2 (Jensen property), Lot 34 Block 2, and Lot 33 Block 2 of the subdivision. The drainage crosses Sunnyside Road and 500S Road via culverts. The drainage collects water from a natural basin which encompasses a portion of the subdivision as well as land to the northeast (Figure 1).

The report also contains a helpful map depicting the "natural drainage" above the Sunnyside culvert. *See* Figure 1.



Figure 1. Drainage basin above Sunnyside Drive culvert.

Dr. Brockway's report then explains through topographic surveys and computer modeling the impact of alterations to the land since 2013 to conclude:

> Because of the fill placed in the ditch on the Jensen property, water accumulating on the Roberts property can now only dissipate by infiltrating into the soil over many days. This is consistent with the observed dissipation of the ponded water after the 2017 event. . . . The fill of the ditch on the Jensen property has increased the hazard to users of Sunnyside Drive, which is a public roadway.
>
>    . . . .
>
> Without the fill, routine drainage flows less than about 1 cfs could be passed through the culverts without overtopping the road. With the fill in its existing condition, both small and routine drainage flows as well as larger runoff events will back up and inundate the road and the Roberts property.
>
> Regardless of the discing or flattening of the ditch on the Roberts property, all the water from the drainage area above the Roberts property will flow to the low point on the Roberts property just above the culvert under Sunnyside Drive. As long as the fill material remains in place in the ditch on the Jensen property, that water will be impounded because of the dam effect created by the fill.

Thus, Dr. Brockway provides what should have been deemed sufficient evidence to avoid summary judgment: (1) evidence of a natural drainage and (2) evidence of changes to the natural drainage that altered its natural flow.

Furthermore, as the Majority notes, Roberts submitted two additional affidavits from witnesses with personal knowledge about the land. Larry Bos testified that he is 53-years-old and has resided in Jerome County his entire life. He worked with his father who had farmed on the subject property for many years. Bos testified that over the years he "observed where natural water

drainage and drainage from irrigation runoff ran to the low point on the property." He explained that the runoff water, "whether from rain and snowmelt in the spring, or waste water from surface irrigation in the summer, always flowed down to the lowest point on the property where the culvert is now located underneath Sunnyside Drive." While the Majority characterizes this testimony as "so generic as to be unhelpful," it confirms Dr. Brockway's testimony that whether the source of the water came from natural precipitation or irrigation, the natural course of the water always took it to the culvert under Sunnyside Drive.

John Root, a licensed surveyor since 1973 who prepared the original plat for the Sunnyside Acres development, testified about his work on the project. He stated that he spent "many hours walking the property." Root observed that "it is apparent that the location of the ditch is the natural drainage that allowed rain or snowmelt to drain through the property to the southern boundary of the subdivision." Additionally, he recalled that the "waste ditch easement" was included in the dedication portion of the plat "to ensur[e] that water from any source, including rain or melting snow, would be able to pass through the property without impediment. That is why nothing was to be placed within the easement which would prevent its use for its intended purpose, as stated in the plat."

Despite this testimony from an experienced engineer with a Ph.D., a surveyor with 45 years' experience who prepared the plat for the subdivision in 1978, and a man who farmed the land with his father for many years, the Majority nonetheless concludes that the "more than a mere scintilla of evidence" standard for withstanding summary judgment has not been met. This, in large part, is due to their conclusion that the condition of the land before placement of the ditch must be proved to establish that this was a "natural" servitude. However, taken as a whole, these three witnesses have done that—they largely confirm that the drainage ditch followed the low point of the land. In light of the scientific principle that has been acknowledged by both sides in this case— that water seeks its own level, which typically takes it downhill via the lowest available route—it makes no sense to conclude that prior to construction of the ditch, the wastewater and run off passing over Jensen's property somehow followed a different, higher course than it does now.

Rather than viewing such evidence in a light most favorable to the party opposing summary judgment, the Majority weighs this evidence and finds it lacking. This is justified on the basis that because this is a declaratory judgment action, with the district judge also serving as the fact-finder at trial, "at summary judgment, the district court was entitled to draw the most probable inferences

from any disputed facts in the case." *See Tiller White, LLC v. Canyon Outdoor Media, LLC*, 160 Idaho 417, 419, 374 P.3d 580, 582 (2016). However, the standard in such circumstances is more properly stated as follows:

> When an action will be tried before a court without a jury, the court may, in ruling on the motions for summary judgment, draw probable inferences arising from the undisputed evidentiary facts. Drawing probable inferences under such circumstances is permissible because the court, as the trier of fact, would be responsible for resolving conflicting inferences at trial. *However, if reasonable persons could reach differing conclusions or draw conflicting inferences from the evidence presented, then summary judgment is improper. Conflicting evidentiary facts, however, must still be viewed in favor of the nonmoving party*.

*Losee v. Idaho Co*., 148 Idaho 219, 222, 220 P.3d 575, 578 (2009) (emphasis added, internal citations omitted). It is humbly suggested that if at least two ostensibly "reasonable persons" who have closely studied this case—in this case both dissenting justices—have reached differing conclusions from the district court and the majority based on the same evidence, perhaps summary judgment is improper. More importantly, because the evidence in the record is clearly in conflict, it must still be viewed in a light most favorable to Roberts regardless of who the trier-of-fact is. The evidence, when properly illuminated in such a light, simply demands that the matter be tried.

Of additional concern is that the majority justifies discounting such evidence by holding that "a party seeking to establish that a natural servitude exists must prove by a preponderance of the evidence that naturally occurring water *drains through natural features as opposed to those that are man-made*." (Emphasis added). This statement plainly suggests that even if a ditch was constructed in the precise location of a preexisting natural channel, it could still not qualify as a natural servitude because it was not a "natural feature." The majority attempts to soften the blow of this characterization of Idaho law by backtracking and adding: "A natural servitude does not lose its character simply because it is further developed by human intervention, but it must first be determined to be a natural servitude." Such reasoning not only fails to alleviate the confusion over whether a man-made drainage ditch could ever be deemed a "natural feature" under the majority's restatement of the law, but it also places a potentially insurmountable burden on parties seeking to enforce a natural servitude in cases involving a long-existing drainage system. In Idaho, it is well-know that many such systems date back to the 19th century and can be well over 120 years old. Consequently, even if a party could prove by the testimony of a qualified expert witness and eyewitnesses that a drainage ditch was constructed in a location corresponding with the natural course for water to flow as it runs down a hill—just as Roberts has done here—that is not good

17

enough. Apparently, they would still lose if they cannot find a witness old enough to testify that they actually observed water naturally draining in the same location before it was "further developed by human intervention." Such an outcome would be especially harsh and unjustified in this case given that the record contains ample proof that the Jensens changed the lay of the land when they filled in the ditch, yet there is no proof that any of Jensens' predecessors changed the lay of the land when they installed the ditch. In fact, the most reasonable inference from the record suggests that the opposite is true.

In so holding, the Majority apparently abandons over a century of Idaho case law recognizing that the "natural" part of a natural servitude is not ascertained by determining whether the channel in which the water flows was constructed by the hands of man; rather, it is determined by whether the water naturally drains along a course dictated by the laws of nature. *See, e.g., Burgess v. Salmon River Canal Co. Ltd.*, 119 Idaho 299, 305, 805 P.2d 1223, 1229 (1991) ("This [civil law] rule requires a lower landowner to accept the surface waters that *naturally drain* from the upper landowner.") (emphasis added); *Dayley v. City of Burley*, 96 Idaho 101, 103, 524 P.2d 1073, 1075 (1974) ("[A] natural servitude of natural drainage between adjoining lands so that the lower owner must accept the 'surface' water which *naturally drains* onto his land.") (emphasis added); *Loosli v. Heseman*, 66 Idaho 469, 474, 162 P.2d 393, 395 (1945) ("Upper land-owner has easement of drainage in land of lower proprietor to the extent of the water *naturally flowing* from the upper to the lower tract; but the servitude in the lower land cannot be augmented or made more burdensome by the acts or industry of the upper land owner.") (emphasis added) (internal citations omitted); *Teeter v. Nampa & Meridian Irr. Dist.*, 19 Idaho 355, 114 P. 8, 9 (1911) ("If the [party] desires to collect flood waters in its canal and let them out through spillways, it may undoubtedly do so. But it must so distribute them as to cause them to flow down over respondent's lands in the *accustomed channels*, and at such places and in such manner as to distribute the waters in like manner and volume as they were *accustomed to flow in their natural course . . . .*") (emphasis added); *Smith v. King Creek Grazing Ass'n*, 105 Idaho 644, 646, 671 P.2d 1107, 1109 (Ct. App. 1983) ("The [civil law] rule recognizes a servitude for natural drainage of surface water. An owner of lower property must accept the burden of surface water which *naturally drains* upon his land.") (emphasis added). These cases properly place the emphasis on the natural *course* of the surface water as it drains from the land, rather than whether the *channel* in which the water flows is a "natural feature."

18

These rulings were based on early common law precedents and reflect the ancient legal maxim, *sic ultere tuo ut alienum laedas* (one must use his own property in such a manner as not to injure that of another), which was cited with approval by this Court in *Loosli*, 66 Idaho at 478, 162 P.2d at 397. Such a policy has promoted the growth and development of Idaho's diverse economy by permitting farmers to till and cultivate their lands, while still allowing for the effective management of seasonal runoff, floodwater, and wastewater. There is no reason to depart from this course. Here, Roberts has clearly provided sufficient evidence through scientific and anecdotal testimony to create at least a genuine issue of fact whether the ditch is located where the flood waters were "accustomed to flow in their natural course." Such evidence is sufficient to merit that Roberts' claims be put through the crucible of trial, rather than summarily dismissed. Therefore, I respectfully dissent.

Justice BEVAN CONCURS.

Exhibit A:

*Enlargement of Recorded Plat, Sunnyside Acres*
*(Originally Exhibit A to Roberts' Complaint,*
*Containing Handwritten Notes Identifying Parties' Properties)*



622.58'
N89°44'46"E

11
10" Conc. Underdrain
15' Esmt.
622.92'
N89°44'46"E

S0°07'28"W    330.00'

**BLOCK 1.**
10

VICINITY SKETCH (Scale: 1"=5000')

R.16 | R.17
T.8S.
T.9S.
SCALE:

CANYONSIDE
SCHOOL

PROPOSED
SUBDIVISION

12

12 | 7
13 | 18

N89°45'34"E    623.26'    136.00'    N89°45'34"E    1326.70'

3.32    335.95    321.36'    321.36'    418.00

15' Esmt.

Roberts
Property

7    6    5    4

202.80    628.67'  N9°24'11"E    628.60'  N9°24'11"E    628.43  N9°24'11"E    671.72'  N20°27'46"E

N0°07'28"E    627.08    324.68'    15' Esmt.

10' Esmt.
1 Ft. West of Ditch

198.00'    300.00'    321.36'    321.36'    200.52'    Ⓓ

Ⓒ

1941.24    N89°44'46"E    SUNNY SIDE DRIVE

159.76'    326.86'    326.86'    326.86'    200.90'    ③
Ⓡ    Ⓑ    50'

Jensen
Property

31    32    35    36    39

308.92    308.92    308.92    308.92    182.85    124.48'

326.86'    326.86'    326.86'    326.86'

N89°44'46"E

208.17    326.86    326.86    326.86    926.86

0    33    34    37    38

308.11"W    208.17    N0°11'E    208.17    208.17    288.22    514.93    441.85    307.11    50'